**Roger BOISJOLY, Plaintiff,**

v.

**MORTON THIOKOL, INC., Defendant.**

**USA ex rel. Roger BOISJOLY, Plaintiff,**

v.

**MORTON THIOKOL, INC., Defendant.**

**Civ. Nos. NC–87–079W, NC–87–091W.**

United States District Court, D. Utah, N.D.

Aug. 31, 1988. As Amended Sept. 13, 1988.

John W. Adler, Catherine E. Tinker, Chicago, Ill., Robert Jordon, III, Morgan D. Hodgson, Barbara A. Pollack, Warren Patten, Washington, D.C., Daniel Boone, Jr., Morton Thiokol, Inc., Chicago, Ill., Darryl J. Lee, Divisional Counsel, Morton Thiokol, Inc., Wasatch Operations, Brigham City, Utah, for MTI.

Robert N. Levin, Washington, D.C., Robert R. Wallace, Salt Lake City, Utah, for plaintiff.

Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah.

Michael F. Hertz, Dept. of Justice, Commercial Litigation Branch, Washington, D.C.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This opinion addresses two separate actions brought by plaintiff Roger Boisjoly against defendant Morton Thiokol, Inc. ("MTI"), both of which arise from the same general circumstances. The actions were instituted in the United States District Court for the District of Columbia and later transferred to this court. The first action, Civil No. NC–87–079W, hereinafter termed the "private action," is before this court on the motion of defendant MTI for judgment on the pleadings pursuant to Rule 12(c). The second, Civil No. NC–87–091W, hereinafter termed the *"qui tam"* action, is before the court on MTI's Rule 12(b) motion to dismiss and Rule 12(f) motion to strike portions of the prayer for relief.

The court heard oral arguments on both motions on February 23, 1988. Appearing for plaintiff Boisjoly were Robert N. Levin and Robert R. Wallace. Appearing for defendant MTI were Robert E. Jordan, Morgan D. Hodgson, Barbara A. Pollack and Warren Patten. Prior to the hearing the court had reviewed all memoranda submitted by the parties and by the United States, which had submitted an Amicus Cu-

riae memorandum in regard to the *qui tam* action. After taking this matter under advisement, the court has further considered the law and facts and now renders the following memorandum decision and order. Based upon the following discussion, the court dismisses all claims in both actions with prejudice, except that Counts V and VI of the private action are dismissed without prejudice by agreement of the parties.

### Discussion

#### A. *Background:*

On January 26, 1986, Flight 51–L of the Space Shuttle Challenger ended in tragedy. Seconds after launch, an explosion destroyed the Shuttle and killed the seven astronauts on board. Shortly thereafter, President Reagan appointed an independent Commission, commonly referred to as the Rogers Commission, to investigate the accident.

In the resulting report (the "Rogers Commission Report")[1], the Commission found that the cause of the accident was a failure in the joint between two segments of the right Solid Rocket Motor ("SRM"). Hot gases escaped through a leak in the joint's seal, and resulted in the explosion that destroyed the Shuttle. The Commission concluded that the failure was due to a "faulty design unacceptably sensitive to a number of factors [including] temperature, physical dimensions, the character of materials, the effects of reusability, processing, and the reaction of the joint to dynamic loading." I Rogers Commission Report 72. It was recommended that the joint be redesigned.

Defendant MTI designed and manufactured the SRM's used in the Shuttle Program, including the SRM found to be the cause of the accident, under an exclusive contract with NASA. Plaintiff Roger Boisjoly is an engineer who was employed by MTI and whose work involved the SRM's.

The Rogers Commission also concluded that a contributing cause of the accident

1. The Report to the President by the Presidential Commission on the Space Shuttle Challenger Accident, June 6, 1986, which contains the findings of the Rogers Commission, is commonly referred to as the Rogers Commission Report and consists of five volumes.

was NASA's decision to launch flight 51–L under unusually cold temperatures, which affected the joint's ability to seal itself, and that the process by which that decision was reached within NASA's complex decision-making hierarchy was itself flawed. It found that engineers at MTI, including Roger Boisjoly, were concerned with the performance of the seals in SRM joints at the predicted temperatures. Prior flights launched at significantly warmer temperatures had experienced incomplete seals and minor gas escapes. The engineers made their concerns known to MTI management and to those NASA officials directly involved with the SRM aspect of the Shuttle Program. MTI management initially recommended to NASA officials that the launch be delayed until temperatures rose. Due to pressure from NASA, MTI management reversed its position and recommended that the launch proceed despite continuing objections from Boisjoly and others.

The Commission found that the NASA officials possessing knowledge of the engineers' concerns and MTI's initial recommendation failed to pass that information to NASA officials above them in the launch decision hierarchy. Those who made the final decision of whether to launch never knew of the specific concerns with the function of the joint seals at the low launch temperature. In sum, the Commission concluded that

> The decision to launch the Challenger was flawed. Those who made that decision were unaware of the initial written recommendation of the contractor advising against the launch at temperatures below 53 degrees Fahrenheit and the continuous opposition of the engineers at Thiokol after the management reversed its position.... If the decisionmakers had known all of the facts, it is highly unlikely that they would have decided to launch 51–L on January 28, 1986.

I Rogers Commission Report 82.

Following the accident, plaintiff Boisjoly testified before the Rogers Commission and congressional committees investigating the accident and its causes. It is these facts, findings and circumstances that form the background for Boisjoly's actions against MTI.

## B. *Private Action:*

Boisjoly seeks to recover compensatory and punitive damages from MTI under a number of common law and statutory causes of action, including defamation, intentional infliction of emotional distress, antitrust, witness tampering, and civil conspiracy.[2] Pursuant to MTI's Rule 12(c) motion for judgment on the pleadings, this court dismisses all claims with prejudice. The court's reasoning on each claim is explained below.

### 1. *Defamation (Count II):*

■ The acts upon which Boisjoly bases his defamation claim are alleged as follows:

71. Since the date of the disaster, [MTI] spokespersons have consistently and falsely attempted to portray Plaintiff as a disgruntled or malcontented employee whose views should be discounted and whose professional expertise should be doubted.

72. The most recent such attack occurred in January of 1987 in an interview between a [MTI] publicist and a professional engineering publication known as the Spectrum wherein the [MTI] spokesperson falsely alleged that plaintiff was "impatient" and had attempted to use vendors and other subcontractors in connection with his work on the joints in violation of the contracts between the government and [MTI].

The Complaint goes on to allege that Boisjoly was injured in his profession due to the alleged conduct of MTI. It does not allege special damages.

The Court holds that the conclusory allegations in paragraph seventy-one do not

---

2. Boisjoly also brought federal and state racketeering claims against MTI based on the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count I) and the Racketeering Influ- ences and Criminal Enterprise Act ("RICE") (Count II). The parties requested at oral argument that these claims be dismissed without prejudice.

meet the particularity requirements with which a defamation claim must be alleged. Utah law requires that a claim must identify the defamatory statement either by its "words or words to that effect;" general conclusory statements are inadequate. *Williams v. State Farm Insurance Co.,* 656 P.2d 966, 971 (1982); *Dennett v. Smith,* 21 Utah 2d 368, 445 P.2d 983, 984 (1968). Although there is no Utah law directly on point, courts have generally required the complaint to also allege when, where, and to whom the alleged defamatory statement was made. *See e.g. Schulze v. Coykendall,* 218 Kan. 653, 545 P.2d 392, 397 (1976). The purpose of the particularity requirement in pleading defamation is to allow the court to decide if the statement is defamatory and to allow the defendant to formulate a defense. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1309, p. 441–42 (1969); 50 Am.Jur.2d *Libel and Slander* § 408 (1970).

Paragraph seventy-one clearly fails to allege, in "words or words to that effect," a single specific defamatory statement by defendant MTI. This paragraph also does not document when, where or to whom any defamatory statement was made. In fact, its conclusory allegations are quite similar to those dismissed for lack of particularity by the *Dennett* court. In the *Dennett* case, the plaintiff alleged that "defendant made, declared and published to certain persons certain derogatory and libelous statements relating and pertaining to plaintiff which tended to degrade and discredit him." *Dennett,* 445 P.2d at 984. *Cf. Goldberg v. Sitomer, Sitomer & Porges,* 97 A.D.2d 114, 469 N.Y.S.2d 81, 83 (1 Dept. 1983).[3]

■ On the other hand, paragraph seventy-two arguably meets the particularity requirements but, nevertheless, fails to allege a statement that is defamatory. By referring to the month during which the alleged defamatory remarks were made, who made them,[4] and in general terms to whom they were made, Boisjoly arguably has put MTI on sufficient notice of what statements it must defend against. Further, by stating that the content of the alleged statement, *i.e.,* that Boisjoly "was 'impatient' and had attempted to use vendors and other subcontractors in connection with his work on the joints in violation of the contracts between the government and Thiokol," Boisjoly has arguably met the "words or words to that effect" standard of *Dennett.*

However, this court does not find the quoted statements to be defamatory. Because he has not alleged special damages, Boisjoly can only recover if the defamatory statement is slander *per se.* *Western States Title v. Warnock,* 18 Utah 2d 70, 415 P.2d 316 (1966). He does claim generally that the statements caused injury to his professional reputation. Such a claim potentially falls into one of the four categories of slander *per se.* *Allred v. Cook,* 590 P.2d 318, 320 (Utah 1979). In order to be actionable, however, a statement in regard to profession must allege conduct "incompatible with the exercise of a lawful ... profession...." *Id.* The words must "impute a want of capacity or fitness for engaging in the plaintiff's profession or ... render him unfit to fulfill his duties." *Id.* Further, because damages are presumed upon a finding of slander *per se,* courts have required that the statement alleged must be found particularly injurious in order to be found defamatory. As stated in *Allred,* "[w]hether defamatory words constitute slander *per se* depends on their injurious character. That is, the words must

---

**3.** In *Goldberg,* the court held that allegations that the plaintiff "became the brunt of a malicious campaign of vilification and ridicule" and "became the subject of numerous assertions" initiated by defendants were not sufficient to meet statutory requirements. The statute required that "[s]tatements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions ... intended to be proved and the material elements of each cause of action". *Goldberg,* 469 N.Y.S.2d at 83.

**4.** While the complaint only identifies the publisher of the allegedly defamatory statement as an MTI "spokesperson," Boisjoly later identifies that person to be Mr. Thomas Russell. *See* Plaintiff's Opposition to Defendant's Rule 12 Motion for Judgment on the Pleadings ¶ 14.

be of such common notoriety that the injury can be *presumed* from the words alone." *Id.* at 321 (citing *Western States Title v. Warnock, supra*) (emphasis added). Stated differently, "it must be seen that as a *necessary* consequence, plaintiff was damaged in some material manner." *Id.* (citing *Nichols v. Daily Reporter Co.,* 30 Utah 74, 83 P. 573 (1905) (emphasis added).

Clearly, the reference to Boisjoly as "impatient" does not fall within this definition.[5] And while a closer question, this court finds that the statement that Boisjoly attempted to use vendors or subcontractors in violation of MTI's contracts also falls short. The statement leaves open to interpretation whether Boisjoly knew that his attempted actions were in violation of MTI's contract. It can be interpreted to imply only that an innocent mistake was made on his part. If a statement is susceptible to at least two interpretations, one of which is innocent, no cause of action will exist for defamation. *Allred,* 590 P.2d at 321. Further, even if the statement had been that Boisjoly's attempt to use subcontractors was in knowing violation of the contract, this court is not convinced that such a statement would reflect so poorly on Boisjoly's capacity or fitness to engage in his profession that it could be presumed that Boisjoly would be thereby damaged. Based on the above reasoning, the court dismisses Count II.

### 2. *Intentional Infliction of Emotional Distress (Count VIII):*

In Utah, the tort of intentional infliction of emotional distress occurs

> where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Samms v. Eccles,* 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961). This court has had occasion to flesh out the definition of the kind of conduct that this tort requires, and has held that in order to be actionable, a defendant's acts must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Amos v. Corporation of Presiding Bishop,* 594 F.Supp. 791, 831 (D.Utah 1984) (*quoting* Restatement 2d of Torts, § 46, comment d.) *rev'd on other grounds,* 483 U.S. 327, 107 S.Ct. 2826, 97 L.Ed.2d 273 (1987). *See also Samms,* 358 P.2d at 347 n. 14 (citing with approval § 46 of the first Restatement of Torts, predecessor provision to that quoted above).

■ Before applying the law to the present case, the court notes that it is proper to dismiss an action for intentional infliction of emotional distress on a Rule 12 motion if all of the elements of the tort are not alleged. In addition, dismissal of a claim is proper if the alleged conduct of the defendant does not rise to the level of outrageousness as required under Utah law. *See Amos,* 594 F.Supp. at 831; *Samms,* 358 P.2d at 346–47. *Cf. Waldon v. Covington,* 415 A.2d 1070, 1078 (D.C.

---

**5.** In Boisjoly's Opposition To MTI's Rule 12 Motion, he asserts a statement not contained in the complaint as an added basis for his defamation claim. The statement was made by Mr. Charles S. Locke, President of MTI, and refers to, among others, Boisjoly:

> Our concern, the concern of my organization, was that because these people were testifying before the [Rogers] Commission and were being somewhat critical of NASA, that it would

be in everyone's best interest to remove them from day-to-day contact with NASA during this period of time.

Opposition ¶ 12.

Even assuming that the complaint can be amended in such a way, this allegedly defamatory statement fails to help Boisjoly's claim as it clearly cannot be construed to cause the kind of injury required of slander *per se.*

App.1980) ("a court may determine whether the plaintiff's allegations, viewed in the light most favorable to the plaintiff, are minimally sufficient to show the existence of the intent [requisite to maintain an action for intentional infliction of emotional distress]").

Turning, then, to the present case, Boisjoly's claim appears to be based on two separate alleged courses of conduct on the part of MTI:[6] First, that MTI recommended that NASA launch the Challenger flight that ended in disaster, contrary to Boisjoly's own recommendation and with knowledge of the pressure that Boisjoly was under, and that MTI knew its actions would be injurious to Boisjoly's mental health. Second, that following the accident, MTI attacked Boisjoly by attempting to discredit him, threatening his employment, and removing him from the investigation of the accident with knowledge that these actions would be injurious to Boisjoly's mental health. Boisjoly claims that these actions caused him to be "severely injured in his emotional and mental health and ... disabled by reason of post traumatic stress disorder and depression caused directly by the disaster and the other matters alleged herein." Complaint ¶ 60.

■ This court holds as a matter of law that neither alleged course of conduct is sufficient to support an action for intentional infliction of emotional distress. As to the first, Boisjoly has not and could not logically allege that either the decision to recommend the launch or the launch itself were acts "intentionally engaged in ... toward [Boisjoly] ... with the purpose of inflicting emotional distress, or where any reasonable person would have known that such would result." *Samms*, 358 P.2d at 346–47. To suggest that the recommendation or the launch were acts directed toward and for the purpose of injuring Boisjoly is ridiculous. Furthermore, for a reasonable person to know that Boisjoly might suffer emotional injury as a result of the launch would include the requirement that the person *know* that the launch would result in disaster. This court cannot accept any suggestion that either MTI or NASA *knew* that the Challenger would explode, but yet recommended that it be launched anyway.

■ As to Boisjoly's allegations that MTI discredited him, threatened his job, and removed him from the investigation of the accident, this court holds as a matter of law that the alleged conduct is not "outrageous" as defined in *Samms* and *Amos*. While threatening an employee's job, discrediting his reputation, and removing him from a position of importance is certainly not desirable behavior, this court does not find it to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Amos*, 594 F.Supp. at 831. *See also Waldon v. Covington*, 415 A.2d 1070 (D.C.App.1980) (harassing, threatening discharge, and assigning embarrassing tasks to employee insufficient to state claim); *Shewmaker v. Minchew*, 504 F.Supp. 156 (D.D.C.1980); *aff'd*, 666 F.2d 616 (D.C.Cir.1981) (harassment, wrongful demotion, and character attacks to media and fellow employees insufficient).

### 3. *Civil Conspiracy (Count I):*

■ There is virtually no Utah law on the subject of civil conspiracy and very little in other jurisdictions. However, those courts that have considered it are in general agreement as to its essential elements and applicability. A representative statement of the elements of civil conspiracy is found in *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir.1983):

(1) an agreement between two or more persons;
(2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an

---

**6.** The complaint does not specifically inform the court which allegations are in support of the claim for intentional infliction of emotional distress; instead, it merely incorporates all of the 111 numbered paragraphs that precede it in the somewhat rambling complaint. It appears that paragraphs 57, 58, 59, 71 and 106 are those upon which this claim is based. Nevertheless, the court has considered the entire complaint in ruling on this claim.

injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Id.* at 477. Implicit in this definition is that the unlawful act be directed toward and cause injury to the plaintiff. Civil conspiracy is essentially a tool allowing a plaintiff injured by the tort of one party to join and recover from a third party who conspired with the tortfeasor to bring about the tortious act or in other words, a method of imposing vicarious liability. *See, e.g., Halberstam,* 705 F.2d at 479; *Hokanson v. Lichtor,* 5 Kan.App.2d 802, 626 P.2d 214, 220–21 (1981); *Fisher v. Freeland,* 279 Or. 177, 566 P.2d 517 (1977). *See generally* Prosser and Keeton, *The Law of Torts* § 46 (5th ed. 1984); Note, "Civil Conspiracy: A Substantive Tort?", 59 B.U.L.Rev. 921, 926 (1979).

 Here, Boisjoly does not attempt to use civil conspiracy to impose vicarious liability on a third party for the torts of MTI. Instead, he attempts to use it to bootstrap himself into a position to recover damages for conduct that, with one possible exception, was neither directed toward him nor the cause of injury to him.

Examination of the complaint proves this to be the case. The complaint first alleges that the purpose of the conspiracy between NASA and MTI was "withholding information from the public, the Congress, flight crews, insurers and owners of payloads as to the unsafe and defective condition of the SRM's in order to induce continued Congressional funding and additional payments from the cargo owners ... and exclusion of all potential competitors to [MTI] for the SRM business." Complaint ¶ 66. The complaint then lists the overt acts allegedly done in connection with the conspiracy, including that NASA lied to Congress and the public about the shuttle safety record and, subsequent to the accident, awarded a $75 million bonus to MTI, based in part on MTI's supposed contribution to the safety and integrity of the Shuttle Program; that MTI withheld information from the SEC, the public, and MTI shareholders and stock purchasers concerning the liability that might arise from the defective SRM's; that MTI pressured its staff to overlook known safety problems; and that MTI attacked the competence of Boisjoly and other engineers who attempted to rectify the safety defects and to stop the Challenger launch that ended in disaster. Finally, the complaint lists the injuries allegedly caused by the conspiracy. These inquiries include the waste of billions of dollars of public funds; the misdirection of the space program; the deaths of the Challenger astronauts and the near deaths of others; the loss of the Challenger payloads; the loss suffered by the insurers of the cargo, the Shuttle hardware, and the lives of the astronauts; and the injuries to the plaintiff complained of in this action.

Clearly, the "conspiracy" alleged in the complaint is not of a nature to support an action for damages on the part of Boisjoly. With the exception of the alleged attack on Boisjoly's competence, neither the conspiracy itself nor the overt acts allegedly done in furtherance of it were directed towards Boisjoly. Further, the injuries allegedly caused by those acts were not injuries to Boisjoly, with the exception of the personal attack. Boisjoly has no standing to sue and recover damages for the alleged waste of taxpayer dollars, the misdirection of the space program, the losses suffered by insurance companies, the injury to MTI stockholders,[7] or the deaths of the astronauts. Attempting to make the same claims under a civil conspiracy cause of action is plainly a misuse of the doctrine and does not rectify a clear lack of standing.

 Similarly, the claimed civil conspiracy is irrelevant to Boisjoly's attempt to recover against MTI based on its attack of his reputation and competence. In this same action, Boisjoly attempts to recover from MTI, the only defendant, for those same alleged attacks based on theories of defamation and intentional infliction of emotional distress. Because civil conspir-

---

**7.** Nowhere does Boisjoly allege that he was a stockholder in MTI.

acy is a tool for establishing vicarious liability, it cannot be maintained in a suit involving a single defendant where the same underlying torts are also asserted by separate counts against the same defendant. *See Dowd v. Calabrese,* 589 F.Supp. 1206, 1214 (D.D.C.1984); *Willems v. Barclays Bank D.C.O.,* 263 F.Supp. 774, 776 (S.D.N.Y.1966).

### 4. *Antitrust (Counts III and IV):*

■ Boisjoly alleges that MTI conspired with NASA to create and preserve MTI's "illegal posture" as the exclusive supplier of SRM's, thereby violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Utah Antitrust Act, Utah Code Ann. § 76-10-914, and Article XII, Section 20 of the Utah Constitution.[8] He further alleges that this practice led to a defective joint design that was the cause of the shuttle accident, and that due to the trauma he suffered as a result of the accident and a subsequent campaign to discredit him in order to cover up the monopolistic arrangement, he is no longer able to pursue his career as an engineer. Thus, Boisjoly claims that due to the alleged anticompetitive practices of MTI and NASA he was injured in his business and property within the meaning of both the federal and Utah statutes and accordingly is entitled to recovery of treble damages. MTI challenges Boisjoly's standing to assert this claim, relying on considerable authority for the proposition that an employee does not normally suffer the kind of injury required by law in order to bring an antitrust action against his employer. As described below, this court holds that Boisjoly has no standing to bring his antitrust claim under federal or state law.

### a. *Federal Claim*

Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost

of suit, including a reasonable attorney's fee." 15 U.S.C. § 15 (1982). Courts have limited this seemingly broad language by allowing standing only if the alleged injury is the type against which antitrust laws were meant to protect and flows from that which makes the defendant's acts unlawful. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The Sherman Act's purpose is to protect consumers from the lack of price competition and to ensure economic freedom to competitors. *See Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983). Courts have generally allowed standing only to direct purchasers of the subject product or competitors in the relevant market, *i.e.,* those "within that area of the economy ... endangered by [the] breakdown of competitive conditions." *Blue Shield of Virginia, Inc. v. McCready,* 457 U.S. 465, 480-81, 102 S.Ct. 2540, 2549, 73 L.Ed.2d 149 (1982) (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973)). Furthermore, standing will be denied if the claimed injury is too causally remote from the alleged anticompetitive conduct. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Based on these limitations, employees claiming to have suffered injury as a result of the anticompetitive activities of their employer have almost universally been denied standing under the antitrust laws. *See, e.g., In re Industrial Gas Antitrust Litigation,* 681 F.2d 514 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983) (employee discharged and blacklisted by industry for refusing to participate in antitrust activity lacks standing to bring action against his former employer); *McNulty v. Borden, Inc.,* 542 F.Supp. 655 (E.D.Pa.1982) (no standing for employee discharged for refusing to partic-

---

8. Boisjoly erroneously cites to Section 2 of the Utah Constitution, which has no relevance whatsoever to antitrust, as the basis of this claim.

The court will consider the claim as if based on Article XII, Section 20, which is obviously the provision that Boisjoly intended to cite.

ipate); *see also Perry v. Hartz Mountain Corp.,* 537 F.Supp. 1387 (S.D.Ind.1982).

This majority position is followed in the Tenth Circuit. In *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (10th Cir.1973), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973), the court relied on the limitations explained above to deny standing to an employee who was discharged when his job became redundant due to the allegedly anticompetitive merger of his employer and another company. In *Winther v. DEC International, Inc.,* 625 F.Supp. 100 (D.Colo.1985) the court carefully reviewed the existing law and relied in part on the binding authority of *Reibert* to hold that a salesman discharged for refusing to enforce his employer's anticompetitive practice lacked standing under federal and state antitrust laws.

Based on this authority and the binding precedent of *Reibert,* this court finds that Boisjoly has no standing to assert his federal antitrust claim. Boisjoly's alleged injury—that he is unable to pursue his career due to the emotional injury suffered as a result of the Challenger accident and by being discredited by MTI—is unrelated to price competition or economic freedom among competitors. It is clearly not the type of anticompetitive injury that the antitrust laws were meant to protect against.

In addition, Boisjoly's claimed injury is not the direct result of the alleged anticompetitive activity. *See Illinois Brick Co. v. Illinois, supra.* His claim rests on the following causal chain: the alleged anticompetitive practice—the creation and maintenance of MTI's position as the sole source of SRM's—led to a defective joint design; the defective joint caused the Challenger accident; the accident led to Boisjoly's emotional injury and to MTI's campaign against him; and finally, that the emotional injury and damaged reputation resulted in Boisjoly's inability to practice his profession, thus injuring him in his business and his property. The claimed injury is simply too causally remote from the alleged anticompetitive act to form the basis for standing.

The sole authority in support of Boisjoly's position is the Ninth Circuit's decision in *Ostrofe v. H.S. Crocker Co., Inc.,* 670 F.2d 1378 (1982), *vacated,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand,* 740 F.2d 739 (9th Cir.1984), *cert. denied,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). In that case, the court allowed standing to a former employee of a paper label company who alleged he had been discharged and thereafter shunned in the industry because he refused to participate in an anticompetitive bid rigging scheme. *Ostrofe* clearly contradicts the decision in *Reibert,* which is controlling precedent in this circuit. *Ostrofe's* holding is also contrary to virtually all other decisions addressing the issue. Thus, *Ostrofe* does not affect this court's holding that Boisjoly lacks standing to sue for treble damages under the federal antitrust laws.

#### b. *State Claim*

Boisjoly also seeks recovery under the civil damages provision of the Utah Antitrust Act. Utah Code Ann. § 76–10–919 (Supp.1988). The Act, which is modeled after and closely resembles the federal antitrust statute, expressly provides that it is to be applied and interpreted consistently with its federal counterpart. Utah Code Ann. § 76–10–926. This court sees no reason to rule differently with respect to the state claim than with respect to the federal claim. Consequently, this court holds that Boisjoly also lacks standing to bring a claim under the Utah Antitrust Act.

As to Boisjoly's attempt to recover damages based on the Utah Constitution, this court finds that Article XII, Section 20 does not provide a separate private right of action for damages. Rather, that Section empowers the legislature to pass laws providing the means by which to enforce against antitrust violations such as the Utah Antitrust Act. A private damages action, if any, must arise under a statute thus enacted.

#### 5. *Obstruction and Tampering (Count VII):*

Boisjoly alleges that MTI removed him from a position from which he could

directly interact with NASA investigators who were responsible for determining the cause of the shuttle accident and for redesigning the defective joints. In addition, Boisjoly alleges that MTI publicly threatened the security of his job. Boisjoly claims that by these actions MTI violated 18 U.S.C. §§ 1505, 1512 and 1513 (1982). Section 1505 makes it unlawful and provides criminal penalties for interference with agency investigations, while Sections 1512 and 1513 do the same for actions constituting intimidation, threats, harassment and retaliation against a witness. For the following reasons this court dismisses these claims by concluding that there is no private right of action for damages under these criminal statutes. Therefore, Boisjoly has no standing to maintain this cause of action.

Since it is clear that the statutes in question do not expressly create a private right of action, such a right exists only if it arises by implication. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court listed four factors to guide judicial determination of whether a private right of action can be implied from a federal statute:

> First, is the Plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the Plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the Plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Cort*, 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted).

In its more recent application of the *Cort* analysis, the Court has made increasingly clear that congressional intent, not judicially supplied policy considerations, is to be the basis of such a decision. *See, e.g.,* *California v. Sierra Club*, 451 U.S. 287, 293, 297, 101 S.Ct. 1775, 1778, 1781, 68 L.Ed.2d 101 (1981); *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). This emphasis has caused the Court to focus on the first two *Cort* factors; only if they are met does the inquiry turn to the last two factors. *See California v. Sierra*, 451 U.S. at 298, 101 S.Ct. at 1781; *Touche Ross*, 442 U.S. at 574–76, 99 S.Ct. at 2488–89.

Applying this analysis to the present case, this court need only focus on the second *Cort* factor in order to find that the statutes at issue do not create a private cause of action. Even assuming that the first *Cort* factor is met, *i.e.*, that Boisjoly's alleged status as an injured witness places him in a class of plaintiffs who have a federal right under Sections 1505, 1512 or 1513, the total lack of evidence in support of the second and most important factor is fatal to an implication of a private right of action.

The second *Cort* factor focuses on the statute itself, and then its legislative history, for evidence that Congress intended that there be a private right of action. In regard to the statutory analysis, this court bears in mind that it must be particularly wary of implying an additional right of action when Congress has already expressly provided a particular remedy or remedies for the statute's violation. *Transamerica*, 444 U.S. at 19, 100 S.Ct. at 247. In such a case, there is effectively a presumption that no additional remedy was intended unless the legislative history contains persuasive evidence to the contrary. *Id.*

In the present case, Congress provided for substantial criminal penalties, including both fines and imprisonment, for violations of Sections 1505, 1512 and 1513. In addition, a statute specifically authorizes the Attorney General to obtain a restraining order in a civil action in order to prevent a violation of those provisions. 18 U.S.C. § 1514 (1982). Upon conviction, a violator

must pay restitution to a person harmed by his actions. 18 U.S.C. §§ 3579, 3580 (1982). In light of the existence of these express remedies, and the absence of any express indication of a private right of action, such a right cannot be implied from the statute itself.

An examination of the relevant legislative history similarly contains no evidence of congressional intent or expectation that there be a private right of action. Section 1505's history is bereft of any reference that might imply a private right of action. *See* S.Rep. No. 225, 79th Cong., 1st Sess. (1945); H.R.Rep. No. 1143, 76th Cong., 1st Sess. (1939).[9] Similarly, the legislative history of Sections 1512 and 1513, provisions of the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 1512–1515, 3579–3580 (1982) ("V.W.P.A."), gives no indication that Congress intended that an injured witness or victim have a right to sue for damages under the statute. If anything, the history of the V.W.P.A. shows the opposite to be true. It reveals that Congress chose not to expressly provide for a private right of action despite its knowledge of and consideration of the fact that courts had universally denied a private right of action under 18 U.S.C. § 1503, the provision that the V.W.P.A. replaced. *See* S.Rep. No. 532, 97th Congress 2d Sess. 28 & n. 23 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2515, 2534 n. 23.

In sum, based on the existence and comprehensiveness of the express criminal and civil remedies provided by Congress for violation of the statutes at issue, the lack of anything in the legislative history implying that Congress intended that there be a private right of action for damages, and the fact that Congress failed to provide for such a remedy when it revamped the witness protection statute by passage of the V.W.P.A. in 1982, despite knowing and having considered that such a right had been denied under existing law, the court concludes that there is no implied private right of action under Sections 1505, 1512 or 1513. Accordingly, Count VII is dismissed with prejudice.

### C. *Qui Tam Action:*

In addition to his private action, Boisjoly seeks to invoke the False Claims Act, 31 U.S.C.A. §§ 3729 to 3733 (West Supp. 1988)[10] ("FCA"), against defendant MTI. The FCA allows the Government, in a civil action instituted by the United States Attorney General, to recover damages and penalties from those who knowingly submit or cause to be submitted false or fraudulent claims for payment to the Government. 31 U.S.C.A. § 3729. The FCA also allows private citizens to initiate and prosecute FCA actions on behalf of the Government, referred to as *"qui tam"* actions, and to share in any recovery that is eventually awarded. 31 U.S.C.A. § 3730(b), (d). Bois-

---

**9.** What little case law exists on the matter is inconclusive. In *Weiland v. Byrne,* 392 F.Supp. 21, 22 (N.D.Ill.1975), the court, with no discussion, held there was no private right of action under 15 U.S.C. § 1505. On the other hand, an implied right of action was apparently held to exist in an unpublished opinion by the D.C. District Court, reference to which is made in the footnotes of two Supreme Court cases, *Nixon v. Fitzgerald,* 457 U.S. 731, 740 n. 20, 102 S.Ct. 2690, 2696 n. 20, 73 L.Ed.2d 349 (1982), and *Harlow v. Fitzgerald,* 457 U.S. 800, 805 n. 10, 102 S.Ct. 2727, 2731 n. 10, 73 L.Ed.2d 396 (1982). The Court did not, however, have the issue before it or in any way endorse the holding of the unpublished case. If anything, the Court discredited the holding when it stated that an argument against a private right of action under Section 1505 would not be "insubstantial." *Harlow,* 457 U.S. at 820 n. 36, 102 S.Ct. at 2739 n. 36.

**10.** In 1986 Congress amended the FCA. *See* False Claims Amendments Act of 1986, Pub.L. No. 99–562, § 2, 100 Stat. 3153 (codified at 31 U.S.C.A. § 3729 to § 3733 (West Supp.1988)); *compare with* 31 U.S.C.A. § 3729 to § 3731 (West 1983) (pre-amendment FCA provisions). These amendments were enacted on October 27, 1986, subsequent to the date of the Challenger disaster, but before this action was filed. Because the provisions defining what conduct constitutes a false claim under the act remain essentially unchanged, the fact of amendment does not affect this court's decision. Thus, the issue of retroactive application of the changed provisions, briefed extensively by the parties and by the Government in an Amicus Memorandum, is not at issue and need not be discussed. All citations are to the amended provisions of the FCA.

joly seeks recovery in this action pursuant to the *qui tam* provisions.

MTI moves to dismiss the FCA claim and to strike portions of the prayer for relief pursuant to rules 12(b) and 12(f) of the Federal Rules of Civil Procedure. As explained below, this court finds that Boisjoly does not state a claim under the FCA.

██ In order to recover under the FCA it must be alleged and proved that defendant

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... *a false or fraudulent claim for payment* or approval;

(2) knowingly makes, uses or causes to be made or used, *a false record or statement to get a false or fraudulent claim paid* or approved by the Government; [or]

(3) conspires to defraud the Government by *getting a false or fraudulent claim allowed or paid* ...

18 U.S.C.A. § 3729(a) (West Supp.1988) (emphasis added).[11] At least two elements are necessary to state a claim under these provisions: (1) a claim for payment from the government, (2) that is false or fraudulent.

The complaint alleges three separate courses of conduct by MTI which must be tested against the basic requirement of a false or fraudulent claim for payment: First, that throughout the life of the SRM contract, MTI supplied NASA with defective SRM's. Second, that MTI's role in the decision to launch Flight 51–L despite abnormally cold temperatures constituted a false claim. Third, that after the disaster and despite its alleged failure to adhere to contract specifications, MTI requested and was paid a bonus by NASA.

Before these actions are examined, however, the court must address a procedural issue.

*1. Rogers Commission Report:*

A threshold issue raised by the parties is whether and to what extent this court can consider the Rogers Commission Report in deciding whether Boisjoly states a claim under the FCA. The Report was prepared after an exhaustive investigation of the shuttle accident and surrounding circumstances, including MTI's actions in regard to the launch decision and the design development and performance history of the SRM. The Report is referenced by page and volume in support of most of the material allegations of the complaint.

██ In determining whether to grant a Rule 12(b)(6) motion to dismiss, a court is not limited to the allegations in the complaint. It may also consider exhibits to the complaint, matters of public record, orders, and other items appearing in the record. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1357 (1969 & 1987 Supp.) and cases cited therein.

Here, while the Rogers Commission Report was not physically attached to the complaint, it was excluded only due to "the mass of [the Report and its] easy public availability." Complaint ¶ 9. It is otherwise cited to and treated in exactly the same manner as those less bulky exhibits, including other government reports, that were physically attached.

This court determines that the pages of the Rogers Commission Report referred to in the complaint are exhibits and can be considered for the purpose of this 12(b)(6) motion. The court is mindful of the deference to be paid to the plaintiff's allegations in the context of such a motion and will not rely on the Report to contradict his allegations of fact. However, the court need not take as true plaintiff's characterizations and legal conclusions and will look to the Report as needed to test these.

*2. Defective SRM's:*

██ Boisjoly alleges that MTI's supply of SRM's to NASA is the basis for an FCA

---

**11.** These provisions are substantively identical to their pre-amendment counterparts. *See* 31

U.S.C.A. § 3729 (1983).

claim. The allegations deemed by the court to be material to this claim are as follows:

16. For many years it has been known to [MTI] and NASA that critical elements of the SRM's, namely certain seals and joints, were defective and likely to cause catastrophic accidents in which the crew, cargoes and elements of the shuttle might all be lost. Vol. I, pp. 120–125, [Rogers] Commission Report.

17. The defective seals had failed on at least 13 Shuttle flights prior to January of 1986, a fact that NASA and Thiokol withheld from the Congress, the public and the astronaut flight crews. Vol. I, pp. 129–131, [Rogers] Commission Report.

\* \* \* \* \* \*

22. Throughout the history of [MTI's] sales of SRM's to NASA, [MTI] made false claims for payments knowing that the SRM's did not meet contract specifications.

Complaint ¶¶ 16, 17, 22.

These allegations on their face are insufficient to state a claim under the FCA. Liability under the FCA is based on the concept of fraud. The circumstances of the alleged false or fraudulent claim should be stated with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Schiff v. Atlantic Basin Iron Works*, 53 F.Supp. 268, 269–70 (E.D.N.Y.1943). The allegations here are simply devoid of any details of the time, place or manner of the alleged false claims.

Further, even assuming that the complaint could be amended to include the required particularity, any claim that might thereby be stated is effectively negated by the additional allegation that NASA knew of the alleged defects in the SRM's. Because FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false. *See, e.g., United States v. Fox Lake State Bank*, 366 F.2d 962, 965 (7th Cir. 1966); *Woodbury v. United States*, 232

F.Supp. 49, 54–55 (D.Or.1964), *modified*, 359 F.2d 370 (9th Cir.1966); *United States v. Schmidt*, 204 F.Supp. 540 (D.Wis.1962). Only if the government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability.

Here, the complaint itself alleges NASA's knowledge of the claimed defects in the same sentences in which those defects are identified. The circumstances of that knowledge are spelled out in those sections of the Rogers Commission Report to which reference is made. What emerges from those pages is the existence of a close interplay between MTI and the branch of NASA responsible for the SRM program, the Solid Rocket Motor Branch of the Marshall Space Flight Center. Design, test, and field performance information was shared between these entities from the inception of the SRM design program in the early 1970's. Results from initial testing of the SRM's in the 1970's showed that the joints and seals functioned differently than had been predicted on the drawing board. These results were shared with Marshall engineers who then raised concerns about the adequacy of joint design. I Rogers Commission Report at 122–24. From a very early date, NASA was aware of the characteristics that form the "defect" upon which this FCA claim is based. In 1980, NASA empaneled a committee to study the flightworthiness of the shuttle system. That committee was also aware of the test results and voiced concern about the SRM joint design and function. In response to its own panel's concerns, NASA stated: "NASA specialists have reviewed the field joint design, updated with larger O-rings and thicker shims and found the safety factors to be adequate for the current design." *Id.* at 125. When MTI discovered that SRM joints retrieved after successful shuttle launches showed signs of leakage, those findings were also shared with NASA. *Id.* at 129–31.

In light of NASA's knowledge of the joint design and performance gained as a result of MTI's disclosures, this court

cannot find the element of falsity or fraud required to support an FCA claim. This court does not hold that it is necessary to allege a lack of government knowledge in order to state a FCA claim; rather, it holds that if the complaint itself alleges that the government knew of those very facts or characteristics which allegedly make the claim false, no claim has been stated.

### 3. *False Certification and Bonus:*

It is also alleged that MTI's actions in regard to the launch of Flight 51–L, and later to a bonus paid to MTI by NASA, subject MTI to FCA liability. This court holds that those actions, as described in the complaint, do not state a claim under the FCA.

The allegations upon which both claims are based are as follows:

20. Subsequent to the disaster and despite the gross failure of [MTI] to adhere to contract requirements, [MTI] submitted requests for, and NASA granted, [MTI] a $75,000,000 bonus for, among other things, [MTI's] "contributions to the safety and and integrity" of the Shuttle program. *See,* Houston Chronicle, November 18, 1986, at 1, Col. 1 attached as Exhibit 3.

21. During the day and most of the night of January 27, 1986, the Qui Tam Plaintiff, Roger Boisjoly and other engineers employed by [MTI] implored NASA to cancel Flight 51–L because the cold weather conditions prevailing at the Kennedy Space Center, the place of the launch, had brought freezing temperatures which were below both the contract specifications for SRM operations and the experience base of prior Shuttle flights. Boisjoly and the other engineers recited to NASA and [MTI's] own management, the history of earlier Shuttle flights and studies which demonstrated that cold weather adversely affected the safety of the seals and in a number of earlier flights had led to near disasters. Vol. I, pp. 82–105, [Rogers] Commission Report.

22. The senior NASA officials involved in the disaster of January 28, 1986, pressured [MTI] to certify the safety of flying the SRM's in those weather conditions and senior managers at [MTI] bent to the pressure and knowingly and intentionally falsely certified the safety of launching 51–L in the weather conditions prevailing at the Cape. Vol. I, p. 97, [Rogers] Commission Report.

23. The false certification aforesaid was done to preserve [MTI's] unlawful monopoly as the sole source provider of the SRM's, ... to protect [MTI's] position to claim the $75,000,000 incentive award aforesaid, and to fraudulently induce the Government to continue purchasing and using the defective SRM's manufactured by [MTI].

Complaint ¶¶ 20–23.

First, as to MTI's acts in regard to the launch of Flight 51–L, the court finds that the so-called "certification" is not "false or fraudulent" as required by the FCA. A copy of the document by which the alleged certification was made, titled "MTI Assessment of Temperature Concern on SRM–25 (51L) Launch," is included in the referenced pages of the Rogers Commission Report at page 97. As its title suggests, the document reflects an engineering judgment and recommendation to NASA in regard to the implication of launching at temperatures colder than previously experienced. It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim.

Furthermore, the circumstances under which the "certification" was made preclude it from being the basis of an FCA claim. Those circumstances, as alleged, are in essence that: (1) MTI had concerns about the safety of the SRM's at temperatures below contract specifications and out of the range of prior launch experience; (2) MTI informed NASA, the contracting government agency, of these concerns and their basis; (3) NASA nonetheless pressured MTI to certify the safety of the SRM's; and (4) MTI gave in to the pressure and certified the safety of the SRM's. The allegation that NASA pressured MTI to make the certification, despite MTI's disclo-

sure to NASA of its safety concerns, negates any element of falsity or fraud that might otherwise exist. These circumstances are simply not the kind against which the FCA is meant to protect.

MTI's request for the $75 million dollar "bonus" or "incentive award" is alleged to be false because of MTI's "failure to adhere to contract requirements." This court has already held that MTI's actions in regard to receiving payment despite alleged defects does not form the basis of an FCA claim due to NASA's knowledge of the alleged defect. This "bonus" claim is effectively a restatement of a claim already ruled against.

### D. *Order*

Based on the foregoing and good cause appearing,

IT IS HEREBY ORDERED that:

1. All of plaintiff's claims and causes of action in both NC–87–079W and NC–87–091W are dismissed with prejudice except Count V and Count VI in NC–87–079W, which are dismissed without prejudice by reason of the agreement of the parties.

2. It appearing to the court at this stage of these proceedings that awardable costs incurred by the defendant are not substantial, the court orders, in the exercise of its discretion, that each of the parties shall bear their own costs.

3. The clerk of the court, pursuant to Rule 58 Fed.R.Civ.P., is directed forthwith to enter a judgment in each of civil actions NC–87–079W and NC–87–091W in accordance with this Memorandum Decision and Order.