**Joan P. LUCKEY, Plaintiff,**

v.

**BAXTER HEALTHCARE CORP., Defendant.**

**No. 95 C 509.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 20, 1998.

As Amended, June 19, 1998.

Todd A. Smith, Devon C. Bruce, Powers, Rogers & Smith, Chicago, IL, for Plaintiff.

Javier H. Rubinstein, Lucia Nale, Bettina Getz, Ronald Philip Gould, Hugh R. McCombs, Jr., Mayer, Brown & Platt, Chicago, IL, William F. Pendergast, Alan M. Buie, Seyfarth, Shaw, Fairweather & Geraldson, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Relator Joan Luckey, a former technician at the laboratories of defendant Baxter Healthcare Corporation ("Baxter"), brings this action on behalf of the United States pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). Count I of the complaint alleges that Baxter made false claims to the United States by (1) misrepresenting its testing of

plasma and plasma based therapies was "adequate and effective"; and (2) misrepresenting compliance with federal regulations, in violation of 31 U.S.C. § 3729(a)(1). In Count II, Luckey alleges that Baxter wrongfully terminated her employment in retaliation for her pursuit of and investigation into Baxter's allegedly false claims, in violation of the anti-retaliatory discharge provision of the FCA, 31 U.S.C. § 3730(h).

The United States has declined to intervene in this action pursuant to 31 U.S.C. § 3730(b)(4)(B). Luckey, however, continues to litigate these claims as the Relator under the *qui tam* provisions of the FCA. Currently before the Court is Baxter's motion for summary judgment on all counts of Luckey's amended *qui tam* complaint. Baxter argues that Count I of Luckey's complaint fails as a matter of law because Luckey has not submitted evidence demonstrating that Baxter knowingly lied to the government to procure a benefit. Baxter similarly characterizes Count II as baseless, contending that the evidence shows that Luckey was terminated for harassing her coworkers and other inappropriate behavior. For the following reasons, Baxter's motion for summary judgment is granted in its entirety.

### RELEVANT FACTS [1]

#### 1. Baxter's Plasma Testing

■ Baxter is one of the world's largest producers of plasma products. Baxter, through its subsidiaries, sells plasma products to hospitals, clinics, health maintenance organizations, doctors' offices, and other medical facilities. Baxter's customers include Medicare, Medicaid, Veterans Hospitals, and other hospitals receiving federal subsidies.

Baxter's plasma products are produced from plasma that is collected from paid members of the general public at donor centers. Plasma is a primary component of human blood and can potentially carry bacterial and viral contaminants, including HIV 1, HIV 2, Hepatitis B, Hepatitis C, Syphilis, and Creutzfeldt–Jakob disease. Prior to incorporating donor-center samples into its plasma products, Baxter sends donated plasma to its subsidiary, Baxter Biotechnology Screening Laboratory ("Baxter labs"), for product testing. Baxter labs conducts several tests to determine whether the donated plasma contains harmful contaminants.

The routine testing protocol includes the Alanine Amino Transfer test ("ALT"), which Baxter labs uses to determine, among other things, the donor's liver quality. Samples yielding low ALT results are subject to additional testing to make certain the samples actually consist of plasma. Baxter became aware that some donor centers were using inadequate plasma collection procedures that failed to prevent saline from mixing with plasma. The presence of excessive saline could impair the screening tests' ability to detect the existence of viral contaminants, causing "false negative results".

Prior to 1995, Baxter labs utilized the Color Inspection Test to evaluate the quality of suspect samples. Under this approach, technicians were directed to inform their supervisors when samples yielded a low ALT result. The supervisor then inspected the sample to determine whether it was clear, cloudy, or colorless. If the sample appeared colorless, the supervisor would order a Total Protein Test to determine whether proteins were present in the samples. The absence of pro-

---

**1.** *See* Northern District of Illinois Local General Rule 12(M)-(N). Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting material relied upon to support the facts set forth." Rule 12(M)(3). Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that re-

quire the denial of summary judgment." Under Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. All properly supported material facts set forth in either party's statements are deemed admitted unless properly controverted. *See* Local Rule 12(M) and (N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994). Moreover, the mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

teins indicated that the sample could be saline diluted, and the sample would be rejected.

Baxter issued Protocol 93–019 to combat the saline problem in the spring of 1993. Protocol 93–019 conceded that samples improperly diluted with saline were presented for testing at Baxter labs. This protocol instructed workers in Baxter labs' customer operations division to examine and evaluate the samples when they first arrive at Baxter, prior to testing. Bychowski Dep. at 153. Baxter subsequently adopted Protocol 94–025 in the spring of 1994 to provide a method to test samples suspected of being diluted with saline. Bychowski Dep. at 163. This protocol enabled technicians to test suspect plasma samples for total proteins. *Id.* at 165. Following an audit by the Federal Food and Drug Administration, Baxter was directed to and did adopt a protocol requiring technicians to perform the Total Protein Test on all plasma samples yielding a low ALT result, regardless of whether the samples were colorless.

Once a sample is approved at Baxter labs, Baxter forwards the sample to another Baxter subsidiary, the Hyland Division of Baxter Healthcare ("Hyland"). Hyland pools plasma from various testing centers to create its plasma products. Hyland's combined pool contains approximately 20,000 liters of plasma.

### 2. Joan Luckey's Employment with Baxter

Luckey began working at Baxter labs as a Lab Technician III in December, 1991. Baxter places all new employees on probationary status for three months, and Luckey was no exception to the rule. As a probationary employee, Luckey was responsible for reviewing data and checking test results for accuracy. Charmaine Bychowski, Luckey's supervisor, evaluated Luckey's performance after 30, 60, and 90 days.[2] Luckey received "acceptable" ratings—the highest rating available—in all categories evaluated on her 30 and 60 day reviews. In Luckey's 90 day

review, however, Bychowski downgraded her assessment of the quality of Luckey's work to "marginal", noting that "[Luckey] released a bundle ... without first submitting it for verification testing. Joan has a fair number of 'missing signature/initials' type of documentation errors." Pl.'s Facts Ex. R. Baxter decided that "in an effort to raise [Luckey's] quality to acceptable, the probationary period will be extended to ten days." *Id.*

In the Spring of 1992, technician Candy Johnson tested and retested a plasma sample, achieving invalid results. Luckey examined the sample, noted that it looked like water or saline, and informed Bychowski of her discovery. Luckey suggested running a Total Protein Test to determine whether the sample was actually plasma. Luckey Dep. at 18. Luckey alleges that Bychowski responded that "we don't look" and "we don't ask questions." Luckey Dep. at 14. Luckey contends that she had continuing discussions with Bychowski regarding the saline incident and the need to use the Total Protein Test consistently. *Id.* at 24.

Bychowski completed Luckey's five month evaluation in May of 1992. Bychowski gave Luckey very middle-of-the-road marks in all categories, but was generally pleased with Luckey's progress, stating that "the quality of work Joan completes is exceptional. She needs to ensure that all necessary precautions are being taken to maintain the highest quality of work, as well. Joan is a very dependable worker." Pl.'s Facts Ex. S. However, Bychowski found the accuracy of Luckey's work was inconsistent ("submits reports that occasionally are missing information"), and that Luckey's people sensitivity skills needed improvement ("occasionally reacts badly to others due to job pressures"). *Id.*

Luckey's one year evaluation showed some improvement. Luckey received high marks for her ability to gather and evaluate information, meet deadlines, and organize her work. Bychowski noted that Luckey was

**2.** In summarizing her performance reviews, Luckey attempts to portray her early assessments as stellar, and her assessments after she began complaining about the saline problem as abysmal—perhaps in an attempt to demonstrate that

Baxter's later poor reviews were only in retaliation for her complaints. A careful reading of those reviews, however, reveals that Luckey's ratings never met either extreme.

"very dependable", aspired to obtain a promotion, and had joined Baxter's Employee Team Committee ("ETC"), a volunteer committee that provided employees with a forum to voice their concerns. *Id.* However, Bychowski also found that Luckey's "work contains preventable errors. She occasionally does not detect discrepancies while verifying." Bychowski Dep. at 308. In addition, Bychowski noted that Luckey was "not always pleasant with her coworkers" or "considerate of others' feelings." *Id.* at 275. On at least four occasions when Bychowski discovered errors in Luckey's work, Luckey refused to accept responsibility and instead accused coworkers of sabotage. *Id.* at 308.

Unfortunately, Bychowski's warnings to eliminate preventable errors did not curtail Luckey's shortcomings in this area. On March 26, 1993, Baxter issued Luckey a verbal warning (documented in writing) for two laboratory errors. Def.'s Facts Ex. I. Luckey received an addendum to the verbal warning on April 9, 1993 for an additional laboratory error. *Id.* at Ex. J. Baxter labs' Quality Assurance department had discovered the errors before the incorrect results were released, and no additional action was taken against Luckey.

In November 1993, Baxter transferred Bychowski to the first shift, and promoted technician Dan Garrett to Bychowski's old position supervising the second shift. Initially, Garrett seemed impressed with Luckey's abilities. In evaluating Luckey's 1993 performance, Garrett found Luckey to be "outstanding" in the technical areas of her work. Garrett noted that Luckey initiated the "Pat on the Back" program, as well as the Health Support Group. Moreover, Luckey was "always looking for ways to improve things in the lab" (Pl.'s Rsp. at 24) and "discovers several errors that others have made and comes up with solutions so they will not occur again." Pl.'s Rsp. at 25. Luckey's difficulty in getting along with her coworkers persisted, however, causing Garrett to note that Luckey "needs to continue to improve in her people sensitivity and to be aware of how she comes across to the listener." Pl.'s Facts, Ex. U.

Luckey sought a promotion to the lead Tech III position in June 1994. When Baxter did not select Luckey for a second round of interviews, Luckey told Garrett that she intended to file an age discrimination suit. Dep. at 138. Baxter instead promoted Manju Tyagi, a pregnant women under the age of 40, of Asian–Indian heritage. Def.'s Facts Ex. 20–H, Garrett Aff. ¶ 6. Shortly thereafter, Luckey drafted a Corrective Action Request ("CAR") categorizing Baxter employees by ethnicity, marital status, pregnancy, and age, among other criteria. Garrett Aff. ¶ 6. Luckey criticized Baxter for promoting only married employees who were under the age of 40, pregnant, and of Indian descent. *Id.* Several of Luckey's coworkers complained to supervisor Dan Garrett, Baxter's Laboratory Operations Manager Joanna Yankula, and Baxter's Human Resource Manager Tracey Mohr that they were offended not only by the CAR, but also by Luckey's assertion that Middle Eastern males traditionally had oppressed women. *Id.*

On June 22, 1994, Garrett and Mohr met with Luckey to discuss these complaints. When Luckey contended that others supported her assessment of Baxter's promotion policies, Mohr indicated that promotion concerns should be taken up with management, not her coworkers.[3] Ex. 20–A. Luckey admitted making the statement about middle eastern males, but claimed that she didn't mean to offend anyone, adding that "ethnics are my friends." *Id.* Mohr counseled Luckey that her intent was not the issue, rather, she had to be cognizant of others' perceptions. *Id.* Luckey was warned that further incidents would trigger disciplinary action. Garrettt Aff. ¶ 9.

On August 16, 1994, Luckey received another verbal warning concerning three laboratory errors, all involving Standard Operating Procedure ("SOP") 235. Def. Ex. 7–K. The first two errors occurred on May 17 and May 24, 1994, respectively. In response to these errors, Garrett suggested that Luckey be retrained on SOP 235. Def. Ex 7–K. Luckey refused, blaming the errors on too

---

3. Luckey denies ever submitting the CAR to Baxter to management (Pl.'s Fact ¶ 74), but admitted to Garrett and Mohr that she created a draft CAR and showed it to some of her coworkers.

may distractions in the lab. *Id.* When Luckey committed a similar error on August 9, 1994, Garrett ordered Luckey to undergo retraining on SOP 235, warning that "these are serious errors, yet you have resisted taking responsibility for these actions. You have told me that it is the number of distractions that are causing these errors, yet other technicians are able to consistently perform this work." *Id.* Luckey signed the warning, but claimed that most of the other technicians were making similar errors. *Id.*

During the first week of September 1994, Luckey's coworker Ken Kerst complained to Mohr about Luckey's behavior in the lab. Def. Ex. 24–B. Kerst explained that Luckey had asked him to sign an affidavit to "help her case." When Kerst responded that he didn't know what her case was, Luckey referred to an incident in 1992, where Char Bychowski allegedly allowed saline-contaminated samples to be improperly processed. *Id.* Kerst denied any knowledge of the incident and refused to sign the affidavit. Luckey persisted for days, finally telling Kerst that "you have no balls" and "you might as well sign it because in November you're going to get laid off anyway." *Id.*

In December 1994, Luckey distributed magnets to at least three of her coworkers. The magnets bore the motto "We won't be promoted" and the acronym "V.I.P.S–N.I.P.S", which Luckey explained stood for the phrase "Very Important People Slated With No Personal Skills." Luckey Dep. at 345–46; Garrett Aff. ¶ 9. After several coworkers complained that the magnets were offensive, (*see, e.g.,* Kerst Dep. at 63–64), Garrett issued Luckey a written warning on December 28, 1994, detailing Luckey's violation of Baxter's Distribution, Solicitation and Vending policy, for "repeated harassment of other employees, and for behavior that is defamatory to [Baxter]." Garrett Aff. ¶ 9. In addition, Baxter counseled Luckey about the impropriety of her earlier remarks to Kerst and warned Luckey that further disciplinary action, including termination, could be taken if the conduct persisted. While Luckey admitted creating and distributing the magnets, she denied offending anyone and pointed to examples of arguably similar but unpunished behavior. Luckey Dep. at 345–46. Luckey denied making the statements to Kerst.

Luckey submitted a letter to Baxter management on January 23, 1995, expressing her belief that Baxter was retaliating against her for her efforts to institute new plasma testing. Def. Ex. 7–M. While admitting that she gave coworkers the VIPS–NIPS magnet, she claimed that she was innocent of the charges raised in the December 28, 1994 warning. Luckey labeled her supervisors and Baxter management "corrupt." *Id.*

Garrett's assessment of Luckey's 1994 performance reflected his frustration with Luckey's behavior. Garrett concluded that while Luckey met most of Baxter's expectations concerning performance objectives, her behavior and interpersonal skills were substandard. Pl.'s Facts, Ex. V. Garrett found that Luckey was argumentative, had offended several of her coworkers, and needed to "improve ... her interpersonal skills" and "he teamwork. She has been openly critical of management decisions and needs to express her concerns to the appropriate individuals." *Id.;* Garrett Dep. at 103. In addition, Luckey had released incorrect test results and violated safety procedures by repeatedly failing to button up her lab coat. Garrett Dep. at 110, 118. While accounting for her difficulty to get along and communicate with others, Garrett's overall assessment of Luckey's performance was generally positive, finding that Luckey "displays initiative and has made several improvements in the lab .... [she] consistently shares ideas for improvements .... Joan thinks outside her position and offers solutions to potential problems. An example of this is her proposal for saline contamination samples." Pl.'s Facts, Ex. V.

In response to Garrett's evaluation, Luckey issued a written comment on February 16, 1995. Luckey charged Garrett and Baxter of being biased against her, characterizing the evaluation as "obviously their answer to my expressed concerns for product safety issues which they do not wish to address." Pl.'s Facts Ex. V. Touting her numerous contributions to Baxter, Luckey noted that "the visible improvements that have taken place within the last year in the issue of saline contamination are due directly to my unceasing efforts to stop the approval of essentially un-

tested plasma for use in plasma products. It is unfortunately not totally corrected, although I have suggested detailed means for accomplishing this (citation to protocol omitted)." *Id.* Luckey rated herself as "perfect" in her self-evaluation, and defined her job responsibilities as updating and revising the currently released Total Protein SOPs, identifying problems and corrective actions required in ALT and Total Protein processing, and suggesting improvements in lab safety and effectiveness.

Despite her "perfect" self-evaluation, Garrett informed Luckey on March 20, 1995 that she would not be receiving a merit-based pay raise. Def. Ex. 24. According to lead lab technician Marie McMahon, Luckey returned to the lab and stated "I did not get anything," but "I don't care if they fire me, I'm ready. I'll have a surprise for them next week." Def. Ex. 24–E. The next day, Luckey asked McMahon to try to convince management that Luckey deserved a raise. When McMahon did not respond, Luckey stated "Well, I'm sorry but you're all going to court." *Id.* On March 22, 1995, McMahon informed Mohr of Luckey's remarks, characterizing them as threatening and coercive. *Id.*

That same day, Ken Kerst told Mohr that Luckey had previously threatened to shut down the lab by early January 1995, and stated that she was "going to get rid of Tracey [Mohr], Wendy [Brendel], Julie [Wetterman], Joanna [Yankula], and unfortunately, Dave [Garrett]." Def. Ex. 24–F. Kerst claimed that Luckey had told him of her plan to move to the south side of Chicago after she shut down the lab because she was afraid that someone from Baxter would try and kill her. *Id.* Luckey confided to Kerst that she would be willing to "forget the whole thing" if Baxter promoted her. *Id.*

Mohr and Garrett interpreted Luckey's statements to McMahon and Kerst as threatening. On March 23, 1995, they suspended Luckey. Def.'s Ex. 7. The written notice informed Luckey that she was being suspended for three days without pay for "repeated harassment of other employees and statements that constitute threats to the safety of the workplace and the well-being of coworkers." Def. Ex. 7–N. Baxter extended Luckey's suspension on March 27, 1995 to allow for further investigation. *Id.* On April 18, 1995, Baxter terminated Luckey, purportedly for the reasons stated in the notice of suspension. *Id.*

### 3. Luckey's Saline–Dilution Complaints

Luckey began complaining about Baxter's handling and testing of samples as early as 1992. Luckey contends that she became aware of saline-diluted samples in the Spring of 1992, after technician Candy Johnson's repeated ALT tests on one sample yielded invalid results. Luckey brought the sample to the attention of supervisor Bychowski, insisting that a Total Protein Test was required to determine if the sample was really plasma, or if it was merely saline. Luckey contends that Bychowski told her that examining samples was not within Luckey's job description. Luckey explains that a determination that the sample was actually saline diluted would require Baxter to prepare an incident report. Incident reports would then alert the Federal Food and Drug Administration ("FDA") of problems during internal audits of Baxter facilities—something Baxter would rather avoid. Luckey insists that Baxter directed the lab technicians to essentially ignore plasma samples possibly tainted with saline.

Despite Bychowski's admonishment, Luckey's coworkers often referred suspicious samples to her. Luckey Dep. at 46, 264. Luckey began documenting all incidents of suspicious samples. Luckey contends that Bychowski repeatedly warned Luckey to stop looking for saline in the plasma samples. Luckey Dep. at 261. Bychowski took Luckey aside and told her "Joan, you are getting managers very angry about the salines. You must stop looking at samples. You must stop proceeding with saline issues, because they are angry, and they will become retaliatory, and I can't protect you." *Id.* Luckey contacted several old colleagues and attorney Leonard Spring about Baxter's practices. *Id.* at 467.

Luckey contends that she "often spoke with [her] coworkers about the saline issue and its severity, how improper testing and misrepresenting results was probably subject

to legal ramifications. And at some point after approximately June of '94, I may have additionally added that I believe they were setting me up to fire me by a paperwork trail." Luckey Dep. at 395. In the spring of 1994, Luckey submitted a written proposal to Baxter management, addressing the issue of saline contamination. Wettermen Dep. at 101–102. Luckey's proposal reiterated her belief that further testing of colorless plasma samples was required to detect possible saline contamination. Luckey conferred with Julie Wetterman, Wendy Brendl (Director of Screening Services at Baxter), and Joanna Yankula in July 1994 about the proposal. *Id.* at 114–15. Even though Luckey repeatedly contacted Wetterman, Brendl, and Yankula about the proposal, she received virtually no information on its progression. By late 1994, Luckey had hired the law firm of Power, Rogers & Smith to represent her in an action against Baxter. *Id.* at 473.

While Baxter had taken some action regarding the saline issue—specifically, by issuing Protocols 93–019 and 94–025—Luckey was concerned that the protocols did not go far enough. Luckey contacted Baxter executive Ms. Dahl in January 1995. Luckey told Ms. Dahl that she "was being accused of offenses I did not commit and that ...[Baxter] was setting up a paperwork trail to fire me, and it was over my concerns of safety violations that I believe [Baxter has] been involved in for a long time and have refused to officially address and solve and resolve." Luckey Dep. at 374. Ms. Dahl asked Luckey to send her a letter regarding their conversation. *Id.* Luckey agreed and sent Ms Dahl a letter dated January 23, 1995, documenting their conversation and informing Ms. Dahl that Luckey had "sought legal advice" and "was advised to appeal to you." *Id.* at 378 However, Luckey acknowledges that she never informed Ms. Dahl that she was considering an FCA action, or that she had contacted anyone at the federal government or the FDA. *Id.* at 375. Similarly, Luckey admits that she never informed anyone at Baxter that she was conducting an investigation of any sort. *Id.*

On January 26, 1995, Joan Luckey filed suit against Baxter for violations of the False Claims Act.[4] Shortly after Luckey's suspension in March of 1995, Baxter instituted a protocol requiring lab technicians to perform Total Protein Tests on all samples yielding an ALT result of five or less. Luckey contends that this protocol represents the required saline testing that she had advocated for years.

## ANALYSIS

### I. Summary Judgment Standards

■ Summary judgment is proper if the record reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts", summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505. In an employment discrimination suit, where credibility and intent are crucial issues, these standards are applied with added rigor. *See Courtney v. Biosound*, 42 F.3d 414, 418 (7th Cir.1994). Finally, this Court is mindful that credibility determinations and weighing evidence are jury functions, not those of a judge when ruling upon a motion for summary judgment.

### II. False Claims Act

■ In order to succeed on her FCA claim, Luckey must establish that Baxter "knowingly present[ed] or cause[d] to be presented" a "false or fraudulent claim for pay-

---

**4.** In compliance with section 3730(b) of the False Claims Act, Luckey's lawsuit remained sealed and Baxter was not made aware of the pending action until after Luckey's suspension. *See* 31 U.S.C. § 3730(b); *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 143 (N.D.Ill. 1993).

ment or approval" to the United States government. 31 U.S.C. § 3729(a)(1). The term "knowingly" means that a person has actual knowledge of the information, or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). Innocent mistakes or mere negligence are not actionable, but a specific intent to deceive is not necessary. *Hindo v. Univ. Of Health Sciences/ The Chicago Medical Sch.,* 65 F.3d 608, 613 (7th Cir.1995), *cert. denied,* 516 U.S. 1114, 116 S.Ct. 915, 133 L.Ed.2d 846 (1996). "The requisite intent is the knowing presentation of what is known to be false." Id. (quoting *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1420 (9th Cir.1991)). "In short, the claim must be a lie." *Id.* (citing *Wang v. FMC Corp.,* 975 F.2d 1412, 1420 (9th Cir.1992)).

Luckey directs the Court's attention to the following "false representations" Baxter allegedly made to the government by falsely claiming compliance with certain regulatory and contractual standards.

***The Establishment License:*** In order to get the required establishment license enabling it to produce plasma products, Baxter had to certify compliance with 42 U.S.C. § 262(d)(1)(a):

"(1) Licenses for the maintenance of establishments for the propagation or manufacture and preparation of products described in subsection (a) of this section may be issued only upon a showing that the establishment and the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products, prescribed in regulations, and licenses for new products may be issued only upon a showing that they meet such standards. All such licenses shall be issued, suspended, and revoked as prescribed by regulations and all licenses issued for the maintenance of establishments for the propagation or manufacture and preparation, in any foreign country, of any such products for sale, barter, or exchange in any State or possession shall be issued upon condition that the licensees will permit the inspection of their establishments in accordance with subsection (c) of this section."

### FSS Contract; DLA Contracts

Baxter represented in each contract that its plasma products "shall be in accordance with the interim item description AA051958." Commercial item description AA0051958, in turn, states under the heading "Regulatory Requirements:"

*Federal Food, Drug and Cosmetic Act* If the product covered by this document has been determined by the U.S. Food and Drug Administration to be under its jurisdiction, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers with the requirements of the Federal Food Drug and Cosmetic Act as amended and regulations promulgated thereunder. In addition, the offeror/contractor shall comply and be responsible for compliance by its subcontractors/suppliers with all other applicable Federal, State, and local statutes, ordinances and regulations.

Pl.'s Resp. at 13. Furthermore, Baxter submitted Certificates of Conformity that stated in relevant part, "In accordance with all applicable requirements for shipment I further certify that the supplies are of the quality specified and are in all respects in conformance with the contract requirements including specifications . . . ." Pl.'s Resp. at 14.

### CLIA Regs

The following regulations are also implicated:

*42 C.F.R. § 493.1205*

"The laboratory must utilize test methods, equipment, instrumentation, reagents, materials, and supplies that provide accurate and reliable test results and test reports. (a) Test methodologies and equipment must be selected and testing performed in a manner that provides test results within the laboratory's stated performance specifications for each test method as determined *under § 493.1213.*"

*42 C.F.R. § 493.1219*

"Remedial action policies and procedures must be established by the laboratory and applied as necessary to maintain the laboratory's operation for testing patient specimens in a manner that assures accurate and reliable patient test results and reports. The laboratory must document all remedial actions taken when—

(a) Test systems do not meet the laboratory's established performance specifications, *as determined in § 493.1213 of this section . . . ."*

*42 C.F.R. § 493.1213,* in essence, § 493.1213 requires that:

"Prior to reporting patient test results, the laboratory must verify or establish, for each method, the performance specifications for the following performance characteristics: accuracy; precision; analytical sensitivity and specificity, if applicable; the reportable range of patient test results; the reference range(s) (normal values); and any other applicable performance characteristic."

*21 C.F.R. § 606.140*

Laboratory control procedures shall include:

(a) The establishment of scientifically sound and appropriate specifications, standards and test procedures to assure that blood and blood components are safe, pure, potent and effective.

(b) Adequate provisions for monitoring the reliability, accuracy, precision and performance of laboratory test procedures and instruments.

Having set forth the applicable regulatory and contractual standards, we must determine whether Luckey has established (1) that Baxter presented a "claim" to the government; (2) the claim was "false or fraudulent"; and (3) that Baxter submitted the claim "knowing" it was "false or fraudulent".[5] *See generally, United States ex. rel. Lamers v. City of Green Bay,* 998 F.Supp. 971 (E.D.Wis.1998); *see also* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS at 2–8 (1998). Although courts differ as to whether damage to the government is an element in a successful FCA claim[6], the Seventh Circuit appears not to require the that the government suffer damage from the false claim. *See United States v. Hughes,* 585 F.2d 284, 286 n. 1 (7th Cir.

1978); *United States v. First Nat'l Bank of Cicero,* 957 F.2d 1362 (7th Cir.1992). While these are all distinct elements, in most cases defendants merely deny that they knew they submitted a false claim—making one argument in attempt to negate both the "falsity" and scienter elements. Examining all elements in this case separately, we start with the first.

**1. The Undisputed Facts Show Regulatory Compliance Was Not A Condition To Receiving Payment Or Another Benefit From The Government**

In order for Luckey to prove the first element, she must show that Baxter made statements or certified its regulatory compliance in order to get a claim paid or approved by the government. Luckey relies, in part, on a theory of "implied certification." That is Luckey alleges that every time Baxter submitted a claim for payment, Baxter implicitly certified its compliance with all statutes and regulations that may apply—by merely accepting payment from the government. Luckey also argues that because Baxter once certified that it complied with all federal regulations to procure its original establishment license, Baxter is forever shadowed by the threat of FCA action if Baxter should ever side step any regulation. In advancing these arguments, Luckey relies upon *Ab–Tech Constr. v. United States,* 31 Fed. Cl. 429 (1994), *aff'd* 57 F.3d 1084 (Fed. Cir.1995), which held that the defendant's submission of payment vouchers constituted an implied certification of compliance with the requirements of section 8 of the Small Business Act.

In *Ab–Tech,* the court held that the defendant's implied certification compliance with requirement's for continued eligibility in a government's Small Business Administration ("SBA") program for minority-owned businesses were "false claims." 31 Fed. Cl. at 434. The defendant signed a " 'Statement of Cooperation' acknowledging their understanding of, and promised compliance with,

---

**5.** *See United States v. Catton,* 89 F.3d 387 (7th Cir.1996) (filing a knowingly false claim implies that the claimant intends to defraud government).

**6.** *See* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS at 2–13 (1998) (citing *Young–Montenay,*

*Inc. v. U.S.,* 15 F.3d 1040 (Fed.Cir.1994); *U.S. ex rel. Stinson v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1258–59 (S.D.Fla.1989); *Blusal Meats, Inc. v. U.S.,* 638 F.Supp. 824, 827 (S.D.N.Y.1986), *aff'd,* 817 F.2d 1007 (2d Cir. 1987); and *U.S. v. Hibbs,* 568 F.2d 347 (3d Cir.1977)).

the programs's requirements for continuing eligibility." The court reasoned that by deliberating withholding the information that it did not comply with the requirements, the defendant caused the government to pay out funds based on the mistaken belief that the defendant was furthering the goals of the SBA program. The court stated that the

> payment vouchers represented an implied certification by Ab–Tech of its continuing adherence to the requirements for participation in the 8(a) program. Therefore, by deliberately withholding from the SBA knowledge of the prohibited contract arrangement with Pyramid, Ab–Tech not only dishonored the terms of its agreement with that agency but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) [SBA] program.... The withholding of such information—**information critical to the decision to pay**—is the essence of a false claim.

*Id.* (emphasis added). The court noted that the Small Business Act was at the heart of the parties' agreement. *Id.* Accordingly, the defendant's failure to properly utilize small and minority-owned businesses not only undermined the spirit of the contract, but constituted a material breach of the agreement.

■ Besides finding *Ab–Tech* to be readily distinguishable from the instant case, the *Ab–Tech* holding must be reconciled with the well-established principle that the FCA is not a vehicle for regulatory compliance. *See, e.g., United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1267 (9th Cir.1996). *United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971, 989 (W.D.Wis.1998) ("The FCA is not a vehicle to police compliance with administrative regulations."). The Supreme Court has cautioned that the FCA is not designed to punish every type of fraud committed upon the government. *United States v. McNinch,* 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). A finding of a false implied certification under the FCA for every request for payment accompanied by a failure to comply with all applicable regulations, without more, improperly broadens the intended reach of the FCA. *United States ex rel. Joslin v. Community Home Health of Md.,* 984 F.Supp. 374, 384–85 (D.Md.1997). Rather, "[t]he key inquiry is whether the

'claim' in question' has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *Lamers,* 998 F.Supp. at 985 (quoting *United States v. Rivera,* 55 F.3d 703, 710 (1st Cir.1995)).

In *U.S. ex rel. Hopper v. Anton,* the Ninth Circuit reasoned that the appropriate inquiry for resolving false certification issues is to examine whether the defendants' compliance with the statutes and regulations in question was a condition to receiving payment from the government. 91 F.3d at 1266–68; *see also Thompson,* 125 F.3d at 902–903 (5th Cir.1997) (holding that the FCA is implicated where the government conditions payment upon the certification of compliance with regulations). The Ninth Circuit ruled that a school district's failure to comply with the Individuals with Disabilities Act in assessing students' special-education needs did not render its request for federal funds a false claim or certification. *Hopper,* 91 F.3d at 1263. The court reasoned that such conduct was not the type of fraudulent activity envisioned by the FCA, but was merely a nonmaterial violation of regulations. The court noted that other administrative remedies existed for remedying the violations in granting the defendant's motion for summary judgment. *Hopper,* 91 F.3d at 1267.

■ In the instant case, Luckey has failed to demonstrate that Baxter's compliance with any statutes or regulations was a material condition to receiving payment from the government. Moreover, Luckey has not pointed to any regulation, statute, or contract provision requiring Baxter to implement certain procedures when screening their plasma samples. The specific direction requiring compliance and materiality present in *Ab–Tech* are noticeably absent here. While Luckey asserts—without further verification and over Baxter's vehement denials—that Baxter had a policy of suppressing the creation of incident reports in an effort to hide evidence of poor quality samples from the government, Luckey fails to demonstrate that the FDA would have withheld payment if Baxter received a certain level of poor quality samples or generated a high number of incident reports. Unlike *Ab–Tech,* there is no evidence that Baxter's practice violated the heart of its agreement with the government.

More importantly, the contracts between Baxter and the government clearly define the remedy for Baxter's failure to comply with any applicable statutes or regulations—should the government determine that Baxter's facilities and procedures are inadequate, the government reserves the right to compel improvements. *See* Ex. 6–A–B000048 (the contract will remain in effect "unless the FDA makes an institutional decision that the violations of federal. law are serious enough in their affect of the quality ... that regulatory action to force involuntary correction is warranted."). This provision contradicts any attempt by Luckey to demonstrate that regulatory compliance was a prerequisite to receiving payment from the government. In light of this, we decline to find that Baxter breached an implied certification material to its request for payment within the ambit of the FCA.

■ Luckey does, however, present one instance that might be considered a certification of regulatory compliance. Baxter concedes that, unlike its FSS contracts, certain of its DLA contracts contained an interim commercial item description, which reads as follows:

> If the product covered by this document has been determined by the [FDA] to be under its jurisdiction, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of the Federal Food, Drug and Cosmetic Act, as amended and regulations promulgated thereunder. In addition, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of all other applicable Federal, State, and local statutes, ordinances and regulations.

See 12(M), Ex. 6(D) at B289. In connection with its shipment of certain plasma derivatives, Baxter provided certificates of conformance to the DLA Contract's terms. *See, e.g., id.* at B298–302. Thus, because Baxter's shipments were directly related to Baxter's getting paid, we find that the first element passes summary judgment muster.

Baxter urges us to disregard the clear language of the contract as too broad to form the basis for a "claim" under the FCA. Citing *Tyger Constr. Co. v. U.S.*, 28 Fed. Cl. 35, 56 (Fed.Cl.1993), Baxter argues that because the certification has no objectively discernable meaning, there can be no claim. However, in *Tyger*, the court held that the defendant did not violate the FCA by submitting a statement that a project was substantially complete in connection with a claim for additional payment. The court concluded that, without an objective contract definition for "substantial completion," the defendant could not have violated the FCA. Here, although the interim commercial item description does not enumerate all FDA regulations, it does explicitly refer to and require compliance with them. For this Court to ignore these regulations because they are not enumerated would render the clause—and the interim commercial item description—meaningless.

Similarly, *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795, 810 (D.Utah 1988) fails to advance Baxter's position. Baxter quotes the *Boisjoly* court's determination that a claim under the FCA must be "a statement of fact that can be said to be either true or false", in support of its contention that the scientific dispute between it and Luckey cannot form the basis of an FCA action. However, the issue of scientific judgment does not come to play in the element of whether or not there is a claim—it merely aids in determining whether or not the claim is false. Courts have characterized false representations of compliance with regulations that are incorporated into government contracts as "claims". *See United States ex. rel. Fallon v. Accudyne Corp.*, 880 F.Supp. 636 (W.D.Wis. 1995); *Lamers*, 998 F.Supp. 971 (W.D.Wis. 1998) (grant applications and standard assurances could constitute "false claims" where defendant falsely certifies compliance with federal grant requirements in order to receive the grants); *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F.Supp. 868 (D.Md.1995). While Baxter may not have explicitly "stated" it would comply with regulations as a condition for payment in the interim commercial description provision, Baxter surely certified that it would do so. Strictly speaking, if Baxter certified its compliance with regulations to the government, in connection with getting payment, Baxter can surely be tested as to whether it did or did not comply with regulations.

Despite our finding that such language could constitute a claim, Luckey fails to sufficiently explain the effect of the contract's clause describing the government's remedy— that the government may compel correction. In addition, a review of the regulations fails to indicate that a certain type of plasma screening is required. Moreover, Luckey's complaint with Baxter's practices focuses only one level of what Baxter describes as a multi-level safeguard process and therefore, Baxter argues, is immaterial to a determination of whether its products are safe.[7] We need not resolve these issues, however, as we find that Luckey cannot satisfy the remaining elements of the FCA.

**2. The Undisputed Facts Do Not Show That Baxter's Certification of Regulatory Compliance Was "False of Fraudulent"**

In order for Luckey to satisfy the second element of a § 3729(a)(1) claim, she must show that Baxter's claim to the government was false or fraudulent. While the terms "claim" and "knowingly" are defined by statute, the terms "false" and "fraudulent" are not. Caselaw, however, lends guidance.

Courts have consistently declined to find that a contractor's exercise of scientific or professional judgment as to an applicable standard of care falls within the scope of the FCA. For example, in *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F.Supp. 868, 886 (D.Md.1995), the plaintiff alleged that the defendant's claims were false on the grounds that the defendant employed "[scientific] practices that irreconcilably deviated from those commonly accepted within the scientific community ...." In granting the defendant's motion for summary judgment, the court held:

> At most, the Court is presented with a legitimate scientific dispute, not a fraud case. Disagreements over scientific methodology do not give rise to False Claims Act liability. *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815–16 (9th Cir.1995); *Wang ex*

*rel. U.S. v. FMC Corp.*, 975 F.2d 1412, 1421. Furthermore, the legal process is not suited to resolving scientific disputes or identifying scientific misconduct.... In any event, [plaintiff's] claims that [defendant's] practices deviated from scientific norms are unsupported by expert testimony. In fact, there is no support in the record for [plaintiff's] contentions that [defendant's] experiments did not comply with the scientific method.

*Id.*

Similarly, in *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996), the court stated:

> The False Claims Act, to repeat, requires a showing of knowing fraud. 'The requisite intent is the knowing presentation of what is known to be false,' as opposed to innocent mistake or mere negligence. 'Bad math is no fraud,' proof of mistakes 'is not evidence that one is a cheat,' and 'the common failings of engineers and other scientists are not culpable under the Act.' The statutory phrase 'known to be false' 'does not mean "scientifically untrue"; it means "a lie." '(citations omitted). Likewise, the statutory phrase "known to be false" does not mean incorrect as a matter of proper accounting methods, it means a lie.

*See also U.S. ex rel. Boisjoly v. Morton Thiokol,* 706 F.Supp. 795, 810 (D.Utah 1988) ("[The certification] reflects an engineering judgment .... It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of a FCA claim.").

■ Here, Luckey presents insufficient evidence to demonstrate that her dispute with Baxter's whole blood testing process is anything other than a matter of scientific judgment. Plaintiff relies upon the testimony of expert Bernard Statland to show that Baxter impermissibly deviated from the standard of care.[8] Even if we were to accept Mr. Statland's testimony, however, the teachings

---

**7.** Baxter presents evidence that the plasma samples were screened before they reached the technicians in the lab, that the tests the lab technicians performed were often repeated, and that

Baxter facilities further treated the samples to eliminate the presence of any contaminants.

**8.** Plaintiff also presented as expert testimony the statement of Ralph Nash, who identifies Bax-

of *Milam* and *Hagood* demonstrate that the mere deviation from scientific norms is insufficient to support an FCA action.

■ In addition, while Mr. Statland testified that Baxter should have performed a Total Protein Test on every plasma sample tested at Baxter labs and that Baxter's failure to do so violated federal laws and regulations, such testimony is inadmissible as an ultimate conclusion under the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Bammerlin v. Navistar Int'l Transp. Co.,* 30 F.3d 898 (7th Cir.1994). We note that Statland was unable to point to any study requiring such testing, any facility—governmental or otherwise—that utilized such testing, nor was he aware of any article or study that had ever criticized Baxter's procedures for screening for saline-diluted samples. Ex. 32. Statland believes that the FDA is wrong for not requiring such procedures. Ex. 32, at 186, 336, 347–48. Statland's inability to point to any source in support of his testimony undermines its usefulness. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333 (7th Cir.1989). We need neither admit nor rely upon expert conclusions lacking in foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ While Luckey continuously challenged the propriety of Baxter's practices, there is no evidence indicating that Baxter lied about them to the government. There is no indication that the contracts or regulation required the type of testing advocated by Luckey, or subjected Baxter to penalties for failing to disclose its refusal to utilize this testing.

### 3. The Undisputed Facts Do Not Show That Baxter Submitted The Claim Knowing It Was False

Assuming *arguendo* that Luckey could show that Baxter's claim for payment was either false or fraudulent, Luckey must still show the third element of a § 3729(a)(1) claim, namely, that Baxter submitted the claim knowing it was either false or fraudulent. The term "knowingly" is defined by the statute as actual knowledge of the information, deliberate ignorance of the truth or falsity of the information, or reckless disregard of the truth or falsity of the information. 31 U.S.C § 3729(b).

In *Wang ex rel. U.S. v. FMC Corp.,* 975 F.2d 1412 (9th Cir.1992), the Ninth Circuit affirmed a district court holding that a corporation did not knowingly submit false claims to the government based on the alleged engineering inadequacies—suggesting a difference between objective fact and a subjective good faith opinion. In summarizing the plaintiff's evidence, the district court noted that

> In support of this claim he offers newspaper accounts and other public documents which indicate that the various weapons systems were poorly designed and/or manufactured. These documents include internal, self-analyzing FMC memoranda regarding the progress and success of the projects. Wang also offers his own personal observations that certain facets of the design of these systems were deficient. These observations are based on his own expertise as an engineer.

*Wang ex rel. U.S. v. FMC Corp.,* 1991 WL 537020, *1 (N.D.Cal. April, 23 1991). The court concluded that such evidence was insufficient to support an FCA action.

The false claim in *Wang* hinged on the criticism of a co-worker's engineering calculations. The Ninth Circuit reasoned that, while a co-workers "lack of engineering insight" "might be proof of a 'mistake' or even of 'negligence' in performing the work," "[p]roof of one's mistakes or inabilities is not evidence that one is a cheat." *Wang,* 975 F.2d at 1421. In finding the scienter element unsatisfied, the court noted that

---

ter's alleged representations. We note, however, that Mr. Nash concedes that his expertise is not necessary to interpret the applicable contracts and regulations. Reply Ex. 31, p. 118 ("I suppose anybody could do that with enough work"). Because the import of Mr. Nash's testimony represents nothing more than the drawing of inferences from the evidence, we find it is inadmissible. *United States v. Benson,* 941 F.2d 598, 603–04 (7th Cir.1991); *Mid–State Fertilizer v. Exchange Nat'l Bank,* 877 F.2d 1333, 1340 (7th Cir.1989) (rejecting an economist's "expert" opinion that drew on inferences from the record rather than any economic expertise).

"[w]ithout more, the common failings of engineers and other scientists are not culpable under the Act." *Id.*

 From this we conclude that, assuming the claim or certification was false, a defendant in a FCA suit would not have "knowingly" submitted a claim if it was submitted as the product of the defendant's good faith professional opinion or judgment. *See id.; see also United States ex rel. Boisjoly v. Morton Thiokol,* 706 F.Supp. 795, 810 (D.Utah 1988) ("[The certification] reflects an engineering judgment . . . . It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of a FCA claim."). Accordingly, while Luckey has produced evidence that Baxter knew of the Total Protein Test, and even knew that some of the plasma samples were diluted with saline, Luckey has failed to demonstrate that Baxter's tardiness in implementing the Total Protein Test was part of a scheme to defraud the government. The FCA prevents this Court from converting what at best can be called Baxter's negligence into a lie.

Even if Luckey could overcome this defect—which she cannot—her claim would still suffer the fatal flaw of ambiguity. For example, in *United States v. Napco Int'l, Inc.,* 835 F.Supp. 493, 497–98 (D.Minn.1993), the court held that ambiguous statutory requirements, where no regulations further define those requirements, cannot hold a defendant to the government's strict interpretation, so long as defendant's interpretation was reasonable. The *Napco* court was confronted with a statute that was ambiguous as to whether certain behavior satisfied it. The statute, the Arms Control Act, required that contractors who procured items for the government were to purchase only items of "American origin." The defendant purchased American-made military supplies obtained from an Israeli firm and certified they were "wholly of U.S.A. origin." The government argued that the statutory language re-

quired the defendant to buy from American entities, while the contractor argued it permitted buying from foreign entities, as long as the items were of American origin. The court noted that the Act states its purpose: "special emphasis shall be placed on procurement in the United States." *Id.*

Despite the purpose and the language of the Arms Control Act, the court held that "the statute does not directly prohibit procurement of the kind made by [the defendant] in this case." The court also noted that "it is equally clear that the [regulatory agency] has not directly addressed the issue of foreign procurement of materials originally manufactured in the United States." *Id.* Accordingly, the court held that the defendant's claims were not false because the statute was ambiguous and the regulations were silent on this issue. *See id.; see also United States ex rel. Milam v. Regents of the Univ. of Cal.,* 912 F.Supp. 868, 884 (D.Md.1995) (holding that applicant's failure to include information in each successive grant application, while inclusion may have been preferable, applicant did not violate FCA because disclosing information "simply was not required by law"); *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 461 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) (finding that defendant credit bureau's failure to reveal its "detective agency" like practices did not violate FCA because the government never "made it clear that it would not employ detective agencies when it contracted for the work").[9]

Therefore, we conclude that while Luckey has produced evidence from which a trier of fact could infer that Baxter was utilizing outdated procedures in screening its plasma samples, there is no evidence that would allow a reasonable jury to conclude that Baxter was committing fraud as required by the FCA. Baxter's motion for summary judg-

---

9. In *United States v. Adler,* 623 F.2d 1287, 1289 (8th Cir.1980) (interpreting 18 U.S.C. §§ 287, 1001), the Eighth Circuit held that if Medicare and Medicaid claims forming basis of prosecution for submitting false claims were ambiguous, the government had burden to allege and prove that statements were false under any reasonable interpretation. Because the government could

not negate the defendant's interpretation as reasonable, the court rejected the government's attempt to prove falsity. *See id.; see also U.S. v. Garfinkel,* 29 F.3d 1253, 1257 (8th Cir.1994) (interpreting 18 U.S.C. § 1001) ("[T]he government ha[s] the burden of negating any reasonable interpretation that would make the statements true.").

ment on Luckey's FCA claim is therefore granted.

## III. Retaliatory Discharge

■ While we find that Baxter did not violate the FCA, this finding alone does not destroy the viability of Luckey's § 3730(h) retaliatory discharge claim. *See McKenzie*, 123 F.3d at 943. A § 3730(h) retaliatory discharge claim can clearly still proceed even if neither governmental action is taken nor any *qui tam* action is contemplated[10], threatened, filed, or ultimately successful. *See Mikes v. Strauss*, 889 F.Supp. 746, 752–53 (S.D.N.Y.1995); *Clemes v. Del Norte County Unified Sch. Dist.*, 843 F.Supp. 583, 595 (N.D.Cal.1994); *United States ex rel. Kent v. Aiello*, 836 F.Supp. 720, 723–24 (E.D.Cal. 1993). Because the employee's failure to assist the government or file his own *qui tam* action is not independently dispositive, we must examine § 3730(h) independently to determine if Luckey is afforded § 3730(h) anti-retaliatory protection.

In 1986, Congress added § 3730(h) to the False Claims Act. 31 U.S.C. § 3730(h). This provision is known as the "whistle blower" provision because it targets employers who retaliate against employees that come forward with evidence that their employer is defrauding the government. *See Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir.1996) (citing S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299). The relevant part of § 3730(h) reads as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).

■ Courts have generally delineated three elements for establishing a § 3730(h) claim: (1) the employee must be engaged in conduct protected by the statute, (2) the employer must know the employee was engaging in such protected conduct, and (3) the employer must have discriminated against the employee because of this protected conduct. *See Zahodnick v. International Business Machines Corp.*, 135 F.3d 911, 913–14 (4th Cir.1997) (citing *X Corp. v. Doe*, 816 F.Supp. 1086, 1095 (E.D.Va.1993)); *Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir.1996) (citations omitted); *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir.1997); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994); *Neal v. Honeywell, Inc.*, 942 F.Supp. 388, 394 (N.D.Ill. 1996); *Mikes v. Strauss*, 889 F.Supp. 746, 752 (S.D.N.Y.1995).[11] It is important to note, however, that term "protected conduct" is interpreted more narrowly when applied to FCA claims than to common or state law retaliatory discharge actions. In a *qui tam* action, the plaintiff must demonstrate that her investigation, inquiries, and/or testimony were directed at exposing a fraud upon the government. *See Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir.1996). Thus, in order for Luckey to recover, she must establish three things: (1) her investigation into purportedly deficient saline-related testing procedures

---

**10.** The Eleventh Circuit declined to limit recovery to only those whistle blowing employees who, before they were fired or discriminated against, actually knew about § 3730(h) of the FCA. *See Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir.1996) ("[Section 3730(h)] contains no knowledge requirement, and we will not read one into it."). The court's holding was not so expansive, however, as to encompass the employee's activities unrelated to exposing or deterring the employer's fraudulent activities.

**11.** Some courts have combined two of the three elements, while others have attempted to separate the elements into distinct categories. While the application is qualitatively the same in both cases, we find it more clear to separate all distinct elements and address them individually so as to give more specific rationale for the case at bar. Also, the later elements are dependent upon the previous elements. For instance, with respect to the second element, it is easy for the employer to know about an employee's activities, but the element requires more. The employer must also know that these activities constitute "protected activity." Therefore, if the first element, which requires an employee to engage in "protected activity," is not met, then neither the second nor the third elements, which assume "protected activity," can possibly be met.

was related to deterring or exposing Baxter's alleged fraud against the government; (2) Baxter knew or was put on notice of Luckey's investigation; and (3) Baxter suspended or fired Luckey because of her investigation.

### 1. Luckey Was Not Engaging In FCA Protected Conduct

The first element of a § 3730(h) claim is that the employee's conduct be protected by the FCA. Courts have considered two components of this element: (1) the type of activity, and (2) the employee's purpose of engaging in the activity. As to the type of activity, Congress made clear that whistle-blower protections should extend to almost any type of activity, "including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." 31 U.S.C. § 3730(h); *see Hopper,* 91 F.3d at 1269; *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935 (6th Cir.1997). Protection was intended to extend "not only to actual *qui tam* litigants, but those who assist or testify for the litigant, as well as those who assist the Government in bringing a false claims action." S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. "Protected activity should therefore be interpreted broadly." S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. This broad interpretation does not, however, eliminate the necessity that the plaintiff's activities be in furtherance of the FCA. Although both the types of activities and who is covered are viewed through broad spectacles, the employee's purpose must not be detached from the False Claims Act in order for the employee to receive the FCA's whistle blower protections.

■■■■ An employee's purpose for engaging in the activity must be "in furtherance of an action" under the FCA. *See Hopper,* 91 F.3d at 1269 ("Section 3730(h) only protects employees who have acted in 'in furtherance of an action' under the FCA."). An "action" under the FCA includes both government-filed FCA actions as well as private *qui tam* actions initiated by the individual employee. While it is quite clear what suffices as an "action" under the FCA, the "in furtherance of" language blurs the pic-

ture. Consequently, we must examine the congressional objectives fueling the language.

■■■■ When Congress enacted the whistle blower provisions in § 3730, it was concerned "that few individuals will expose fraud if they fear their disclosures will lead to harassment." S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. With this concern in mind, Congress had primarily two objectives in enacting the whistle blower provision: (1) to "halt companies and individuals from using the threat of economic retaliation to silence 'whistle blowers,'" and (2) to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." *Id.* The statute's whistle blower protections are aimed at employees "exposing fraud" or attempting to "expose fraud," not employees with concerns wholly detached from the purportedly fraudulent activity. Divorcing the fraudulent ingredient from the acts is wholly contrary to what Congress intended. Therefore, under § 3730(h), the purpose of the employee's investigatory activity must contain at least some ingredient of uncovering fraudulent activity.

Many courts have interpreted the "in furtherance of" language by emphasizing that the employee's activity must be fueled by, or at least somewhat connected to, her employer's fraudulent activity in submitting false claims for payment to the government. *See, e.g., Robertson v. Bell Helicopter Textron,* 32 F.3d 948, 950–52 (5th Cir.1994) (holding that a plaintiff must be investigating fraud in order to bring a FCA suit to be protected under § 3730(h)); *Neal v. Honeywell,* 33 F.3d 860, 864 (7th Cir.1994). The broadest reading of the "in furtherance of" language was enunciated by the Ninth Circuit in *Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir. 1996). In *Hopper,* the court stated that the "in furtherance of" language extends to situations where "a plaintiff is investigating matters which are calculated, or reasonably could lead to a viable FCA action." 91 F.3d at 1269. The *Hopper* court held, however, that this broad "reasonably could lead" language fell short of extending to situations where the employee was neither "trying to recover money for the government" nor "investigat-

ing fraud." *Id.* In short, even under the broadest reading of the "in furtherance of an [FCA] action," an employee's activities that are not related to exposing or deterring fraud, are not "whistle blowing as envisioned in the paradigm *qui tam* FCA action." *Id.*

The *Hopper* court held that, as a matter of law, an employee's investigation into her employer's regulatory non-compliance and persistent attempts to get her employer to comply with federal and state regulations, by themselves, were not activities done "in furtherance of an [FCA] action." *Id.* at 1269 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). Hopper worked as a special education teacher for her employer, the School District. After twenty years of service, Hopper "began complaining to her supervisors that the School District was failing to comply with federal and state laws regarding the handling of special education children." *Id.* at 1263. Specifically, she alleged that the School District was violating the California Educational Code ("CEC") and the Individuals with Disabilities Education Act ("IDEA"). These purported violations were grounded in the fact that the School District was permitting special education teachers, rather than the students' classroom teachers, to assess whether a student belonged in the special education program. Hopper reported these violations to the California Department of Education which later decided that the School District was in violation of CEC and warned the School District that failure to comply would result in a recovery of state funds.

When the School District continued its alleged violations, Hopper reiterated her prior complaints. The School District suspended her, basing the disciplinary action on a parent's allegation that, contrary to school policy, Hopper gave the parent permission to bring her son late to school. Hopper denied ever giving the parent permission. Hopper was later fired for the same reasons she was suspended. Hopper then filed a *qui tam* suit against the School District claiming she was fired in violation of § 3730(h).

In finding that Hopper was not acting "in furtherance of" a FCA action, the court reasoned that:

the record quite clearly shows Hopper was merely attempting to get the School District to comply with Federal and State regulations. Her numerous written complaints, seventy letters and over fifty telephone calls were all directed toward this end. She was not trying to recover money for the government; she was attempting to get classroom teachers into the ... evaluation sessions. She was not investigating fraud. She was not whistle blowing as envisioned in the paradigm *qui tam* FCA action. *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 742 (9th Cir.1995) (en banc), *cert. denied,* 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). Quite plainly, the thrust of her complaints was that the School District was failing to meet its IDEA obligations to its students.

*Id.* at 1269. The *Hopper* court went on to state that, while "[c]orrecting regulatory problems may be a laudable goal, [it is not one] actionable under the FCA in the absence of fraudulent conduct.... [Hopper's] investigatory activity did not have any nexus to the FCA." *Id.*

 We find this reasoning persuasive. In the case at bar, Luckey's conduct was consistently directed at convincing Baxter to upgrade its procedures to include testing for saline-diluted samples. This is evidenced by the proposals Luckey submitted and her complaints to her supervisors and Baxter management. While Luckey was concerned about Baxter's testing procedures and its discipline of her, there is no evidence that Luckey's activities were related to exposing a fraud upon the government. We acknowledge Ms. Luckey's efforts as laudable and note that Baxter's current testing incorporates the suggestions that Luckey raised for years. This does not alter our conclusion that we cannot equate her zeal to compel Baxter's utilization of the Total Protein Test into an attempt to reveal a fraud upon the government. We decline to extend general investigations of regulatory non-compliance into per se employee investigations of an employer's alleged fraud upon the government.

Two courts have dealt with § 3730(h) actions in which the employee's investigation concerned her employer's testing procedures. In *Neal v. Honeywell,* the Seventh Circuit held that § 3730(h) applied to an employee who assisted the government in its investigation of fraud even though no false claims action was ever filed. 33 F.3d 860, 861 (7th Cir.1994). The court did not specifically address the "in furtherance of" language, however. Neal investigated her co-worker's falsification of data from an ammunition test administered by her employer. Neal told her employer's legal counsel about the fraud and this attorney subsequently notified the government. The government began an investigation that resulted in both a settlement between Neal's employer and the government and Neal's co-workers pleading guilty to defrauding the government. Because of Neal's accurate investigation into her co-worker's fraudulent activity, Neal's supervisors harassed her and threatened her with physical harm. The court held that Neal had a viable § 3730(h) claim against her employer despite the absence of a FCA suit. Though not faced with the question, the court in dicta suggested that Neal's activity, "supplying information that set off an investigation, fits comfortably into [FCA protected investigatory activities]," reasoning that "when Neal reported what she had learned, litigation was a distinct possibility." *Id.* at 864.

*Neal,* however, is distinguishable from the case at bar. Neal was not testing the validity of the testing procedures, but instead informed proper legal authorities of her employer's falsification of ballistics test results in the production of ammunition for the government. Such activity represents the conduct of the quintessential whistle blower. Conversely, Luckey's activities simply involved an effort to secure methods to guarantee that plasma samples were not contaminated or improperly diluted. Unlike the plaintiff in *Neal,* Luckey was not investigating Baxter's falsification of the test results. When viewed in the best light, Luckey was trying to help her company achieve better results.

In *Mikes v. Strauss,* 889 F.Supp. 746, 752–53 (S.D.N.Y.1995), the court found protected activity where an employee investigated her coworkers' inappropriate use of tests, and reported her conclusions to her employers. Critical to the court's holding, however, was the fact that the employee's complaints were coupled with her charges that the employer was inappropriately using—or overusing—the tests to fraudulently inflate Medicare patients' bills, for which the government was partially responsible. *Id.* at 752–53.

The critical aspect of the *Mikes* decision is fatally lacking in the case at bar. While there are substantial similarities between the activities of the employee in *Mikes* and Luckey's conduct, Luckey failed to take the important step necessary to support an action under the FCA—pursuit of a belief that Baxter was defrauding the government. At most, we can characterize Luckey's conduct as an attempt to ensure regulatory compliance. However, these activities are insufficient to constitute an investigation into fraud. *See Zahodnick v. International Business Machines Corp.,* 135 F.3d 911, 913–14 (4th Cir.1998) (simply reporting a general concern of a overcharging the government does not suffice to establish that Zahodnick was acting "in furtherance of" a *qui* tam action); *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir.1994). Accordingly, while Luckey's activities may have been considered "protected conduct" in certain state and common law retaliatory discharge actions, they were not "protected" as being in furtherance of an action under the FCA.

**2. Even If Luckey Engaged In Protected Activity Under The FCA, There Is No Evidence Baxter Knew That Luckey Intended To Utilize Evidence Of Regulatory Non-Compliance in Furtherance Of An FCA Action.**

The second element of a § 3730(h) claim is that the defendant employer must know or be put on notice that the employee was engaging in activities that might subject the employer to a FCA action. "The legislative history [of § 3730(h)] makes clear that a whistle blower must show the employer had knowledge the employee engaged in 'protected activity.'" *Robertson,* 32 F.3d at 951 (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300). Thus, to prove the notice ele-

ment of a § 3730(h) claim, an employee is "required to present evidence from which a jury could reasonably find that defendant was on notice that 'plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'" *U.S. ex rel. Yesudian v. Howard Univ.*, 946 F.Supp. 31, 33 (D.D.C. 1996) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994); *Mikes v. Strauss*, 889 F.Supp. at 753).

 A *qui tam* plaintiff can satisfy the notice element in two ways: expressly or implicitly. This element is readily satisfied if the employee expressly indicates that she is either assisting the government in a FCA action or contemplating her own private *qui tam* action. In her deposition testimony, however, Luckey states uncategorically that she never informed anyone at Baxter that she was conducting an investigation of any sort. Luckey Dep. at 236–37, 375. Like most courts confronted with such a record, we must then test whether the Luckey's conduct was sufficient to put Baxter on notice of a possible FCA action. *See, e.g., Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir.1994) (absent express indication, an employee's conduct that demonstrates a possibility of a FCA action may satisfy notice requirement).

Cases finding an employer was put on notice that the employee's activities might subject the employer to a FCA action involved the employee's reference to a possible *qui tam* action or assistance in a government FCA investigation. *See, e.g., United States ex. rel. McKenzie v. Bellsouth Tel.*, 123 F.3d 935 (6th Cir.1997); *Childree v. UAP/GA AG CHEM., Inc.*, 92 F.3d 1140 (11th Cir.1996). In *McKenzie*, the court found that the employer did have notice that a whistle blowing employee was engaged in activities "in furtherance of" a FCA action. The *McKenzie* court based its finding on the fact that the employee "br[ought] the alleged fraud to the attention of her supervisors and show[ed] them a newspaper article describing [another company's employee's] *qui tam* action ... involving similar allegations of fraud." *Id.* at 944. The *Childree* court similarly found the notice element satisfied. The court based its finding upon the fact that the employer acted against an employee after the employee pro-

vided the government with extensive information about her employer's fraudulent billing practices and testified in a hearing before the Department of Agriculture about the suspected fraudulent billing scheme. 92 F.3d at 1143, 1146.

Conversely, there was no evidence that Baxter was aware that Luckey had contacted the government, was investigating possible fraud, or was even contemplating participation in a fraud investigation Rather, the instant action more closely parallels those cases finding that the employees' conduct was insufficient to give the employers notice of an impending fraud investigation. *See Hopper*, 91 F.3d at 1270; *Yesudian v. Howard Uni.*, 946 F.Supp. 31, 33–34 (D.D.C. 1996); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948 (5th Cir.1994).

The *Hopper* court makes clear that the employer must have information to reasonably conclude that the employee was engaging in activities "in furtherance of an [FCA] action":

> [U]nless the employer is aware that the employee in investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h). *Robertson*, 32 F.3d at 952. "The legislative history clearly provides that a whistle blower must show the employer had knowledge the employee engaged in 'protected activity.'" S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300.

*Hopper*, 91 F.3d at 1269. Hopper had consistently complained of and persistently urged her employer School District to comply with state and federal regulations via numerous written complaints, seventy letters, and over fifty phone calls. Certainly, the School District was aware that the employee was concerned with the School District's compliance with applicable regulations. The court nonetheless found such conduct insufficient to satisfy the notice requirement, and stated that:

> Even if [Hopper's supervisor] w[as] intimately familiar with Hopper's complaints, Hopper never gave any indication she was investigating the School District for defrauding the federal government. [Hop-

per's supervisor] may have engaged in retaliation for Hopper's activities, but the record does not show any connection to the FCA.

*Hopper*, 91 F.3d at 1270. Thus, where an employee voices her concerns about her employer's improprieties, without incorporating any fraudulent component into her complaints, the employer cannot be said to have the requisite notice that employee's activities were done to further a FCA action.

Similarly, the *Yesudian* court held that the notice requirement was not met where the employee lodged complaints but failed to indicate the nexus between her complaints and the FCA. *Yesudian*, 946 F.Supp. at 33–34. Yesudian worked for Howard University's purchasing department. He repeatedly complained to university management about alleged improprieties in the purchasing department, *e.g.*, preferential treatment of workers and vendors in the purchasing department. He was then terminated.

The court reasoned that although Yesudian presented evidence showing that his employer knew about his complaints, "there was absolutely no evidence from which the jury could have found that [his supervisor] believed that plaintiff was contemplating a *qui tam* suit against him or assisting the government in an investigation." The court relied on the fact that

> Plaintiff never suggested to defendant that he intended to utilize his allegations in furtherance of a[FCA] action; gave no indication that he was going to report the alleged improprieties to government officials; and took no other steps which would put defendant on notice that he was acting in furtherance of a[FCA] action. (citations omitted). At no time did plaintiff allege that defendant was defrauding the government. Nor did plaintiff ever assert that the alleged improprieties involved funds provided by the federal government.

*Yesudian*, 946 F.Supp. at 33–34. The court ultimately held that Yesudian's countless complaints about the university improprieties did not put his employer on notice that he was "either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Id.*

Finally, in *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948 (5th Cir.1994), the Fifth Circuit held that an employee's investigations into and complaints about his employer's overcharging on government contracts was not sufficient to satisfy the notice element of § 3730(h). In *Robertson*, the employee worked as a contract administrator for a government contractor. The employee voiced his concerns to his employer that it might be overcharging the government on its contracts. The court indicated that an employer would be on notice of possible FCA action where the employee "express[es his] concerns about possible fraud to their employers." *Id.* at 951. The court, however, found that the employer was not on notice because the employee had never referred to the overcharging as illegal or fraudulent, nor did the employee ever assist governmental officials or voice any intention to file a *qui tam* action. *Id.*

 Thus, it is clear that the employer must be on notice, not only of the voiced concerns and investigations of the employee, but that the employee's actions are related to the employer's alleged false claims to the government. In other words, the employee must, at least to some degree, couch her concerns or investigation in terms of funds her employer fraudulently obtained from the government. This is the element missing from Luckey's complaints. There is no denying that Luckey's concerns were consistent and ongoing. Unfortunately, Luckey has failed to draw this Court's attention to any evidence that she gave Baxter notice that she believed their activities were fraudulent. Instead, Luckey relies on three instances where she threatened court action. First, after failing to receive a promotion, Luckey specifically threatened an age discrimination suit. Next, Luckey informed coworker McMahon that "they" were all going to court, without further explanation. Finally, Luckey asserts that she may have informed some of her coworkers that Baxter's refusal to implement the Total Protein Test in the manner she suggested would have legal implications, but fails to identify anyone who could corroborate this testimony. We find these remarks too ambiguous to reasonably alert Baxter of a potential *qui tam* suit. Luckey never indi-

cated that she was contemplating or that her actions could reasonably lead to a fraud suit. Accordingly, Luckey fails to satisfy the second element necessary for a *qui tam* action.[12]

### 3. Finally, There Is No Evidence Baxter Discriminated Against Luckey Because of Her Investigation Into FCA Activities.

Lastly, Luckey must demonstrate that Baxter discriminated against her because of her conduct. In other words, the Luckey must establish that Baxter possessed the retaliatory intent when discharging the her, in violation of § 3730(h). *See Robertson,* 32 F.3d at 952.

In a recent case, *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935 (6th Cir.1997), the Sixth Circuit observed that § 3730(h) "provides relief only if the whistle blower can show by a preponderance of the evidence that the employer's retaliatory actions resulted 'because' of the whistle blower's participation in a protected activity." *Id.* at 944 (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986) *reprinted in,* 1986 U.S.C.C.A.N. 5266, 5300). The court further recognized that " § 3730(h) allows internal or intra corporate whistle blowers to recover for retaliation," but noticed that courts "have given the internal whistle blower a heavier burden to carry when seeking relief under § 3730(h)." *Id.* at 944; *see also United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1522 (10th Cir.1996).

In *McKenzie,* the Sixth Circuit examined the causal connection between the employee's allegedly protected activities and the discharge. In affirming a district court's interpretation of the causal element, the McKenzie court stated that

[A]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it.

*Id.* at 944. This clearly ties the discharge not only to the employee's activities, but also to the employer's knowledge that the employee's activities were in furtherance of a FCA action.

Courts have found the causal connection element to withstand judgement as a matter of law where there is circumstantial evidence strong enough to create a reasonable inference that the employee was discharged because of her activities "in furtherance of" a FCA action. *See, e.g., Childree,* 92 F.3d at 1144–46 (employee for five years was discharged one week after testifying before government agency about her employer's suspected fraudulent government billing scheme). Courts have, however, declined to find that the issue of causal connection is *per se* satisfied where the employee demonstrates only two requirements (1) that his activities were FCA protected, and (2) that his employer knew of the employee's protected activities. *See, e.g., Hopper v. Anton,* 91 F.3d 1261, 1269–70 (9th Cir.1996) (held that the employee failed to present evidence to support a jury verdict on a FCA retaliation claim because the employee never gave any indication that she was investigating school district for defrauding the federal government; although employer may have engaged in retaliation for plaintiff's activities, there was no connection to the FCA); *see also Robertson,* 32 F.3d at 951. Thus, an employ-

---

**12.** Having determined that Luckey failed to put Baxter on notice of an impending fraud investigation, we need not address Baxter's additional argument concerning situations where an employee's investigatory activities overlap with the employee's regular job duties. We note, however, that courts have found the fact that the employee's job duties coincide with his investigation not to be fatal to the notice requirement. The majority trend, however, discloses a reluctance to find that an employer was on notice of possible FCA action where the employee's investigatory activities into her employer's improprieties or purported fraud consisted only of conduct that was part of the employee's job duties. *See Rob-*

ertson, 32 F.3d at 951–52; *see also X Corp. v. Doe,* 816 F.Supp. 1086, 1095–96 (E.D.Va.1993) (lawyer's discussion of employer's potential *qui tam* liability was part of his job and, because lawyer did not indicate that he might bring such an action, employer was not on notice). In fact, one court has gone so far as to hold that an employee whose investigatory activities involved his regular job duties, while not precluded from bringing a § 3730(h) claim, "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Ramseyer,* 90 F.3d at 1523.

ee must provide some evidence that would allow a reasonable jury to draw the required causal inference.

In the case at bar, Luckey provides evidence she believed that Baxter intended to eliminate her because of her saline dilution complaints. Luckey's beliefs, however, are insufficient to create a genuine issue of material fact. The court in *X Corp. v. Doe*, 816 F.Supp. 1086, 1096 n. 17 (E.D.Va.1993) was faced with a similar situation, and stated that the employee

> essentially relies on his own belief that he was discharged because [ ] the Management Committee believed his actions were in furtherance of a *qui tam* action. But [the employee's] beliefs, no matter how firmly held, are not themselves sufficient to withstand entry of summary judgment.

Moreover, "an employee who ... just imagines fraud but lacks proof, legitimately may be sacked." *Neal v. Honeywell*, 33 F.3d 860, 864 (7th Cir.1994) (stating that employees who behave like "chicken little" impose unnecessary costs on employers). While Baxter ultimately adopted a protocol incorporating many of Luckey's recommended procedures at the suggestion of the FDA, the FDA took no further action against Baxter. Disregarding evidence of Luckey's beliefs, we find that the evidence supports Baxter's contention that it terminated Luckey because of her coworker's complaints about Luckey's behavior.

■ Baxter has presented extensive evidence that it legitimately believed that Luckey's personal skills were lacking, and that her supervisors received complaints that Luckey made inappropriate racial remarks, and offended and harassed her coworkers. Luckey denies making some of the statements, and disputes that her coworkers found her behavior offensive, but she cannot ignore the concrete evidence that her coworkers did in fact complain about her. Luckey insinuates that when she arrived at Baxter, Baxter found her to be an ideal employee, and that only after she complained did Baxter find the need to pursue disciplinary action against her. However, the record shows that even in Baxter's earliest reviews of Luckey, Baxter had concerns about Luckey's performance and her ability to get along with her coworkers. Moreover, a review of Luckey's evaluations reveals that her supervisors actually applauded Luckey's efforts to improve lab safety in general, and testing for saline specifically. See Pl.'s Rsp. at 24 (Bychowski's 1993 evaluation of Luckey's performance—written after Luckey's complaints began—is more favorable than her review of Luckey's 1992 performance, and notes that Luckey was "always looking for ways to improve things in the lab."); Pl.'s Facts, Ex. V (Garrett's 1994 review commends Luckey for thinking outside her position, as demonstrated by her saline contamination proposal).

Luckey bears the burden of producing evidence that demonstrates the probability, not the mere possibility, of a discriminatory motive. She has failed to demonstrate a causal connection between her termination and Baxter's knowledge that she was conducting an investigation into Baxter's purportedly fraudulent activity. Having determined that her beliefs are insufficient evidence of Baxter's unlawful intent, we further find that Baxter has presented sufficient evidence to show that its motives for terminating Luckey were neither improper nor pretextual. Accordingly, we find that Luckey cannot satisfy the elements of a retaliatory *qui tam* action.

## CONCLUSION

Joan Luckey pursued her belief that Baxter's testing procedures were inadequate to detect the presence of excessive saline in plasma samples. Armed with the knowledge that saline-diluted samples could produce false negative results and potentially harm the public, Luckey was persistent in her efforts to convince Baxter to adopt more rigorous screening procedures. Such conduct, however admirable, does not afford Ms. Luckey the protections of the FCA—nor does Baxter's failure to embrace Luckey's recommendations warrant its penalties. The purpose of the FCA is to curb fraud against the government, not to ensure regulatory compliance. Therefore, Baxter's motion for summary judgment must be granted in its entirety. This case is hereby dismissed with prejudice. The Clerk of the Court is directed to enter judgment, pursuant to Fed.

R.Civ.P. 58, in favor of defendant Baxter and against plaintiff Luckey.